IRA A. NAGEL, administrator[1] *vs.* PROVIDENT MUTUAL LIFE
INSURANCE COMPANY OF PHILADELPHIA.

No. 98-P-2371.

Suffolk. December 13, 2000. - June 5, 2001.

Present: RAPOZA, DREBEN, & SMITH, JJ.

*Insurance,* Life insurance, Cancellation. *Practice, Civil,* Summary judgment,
Interest. *Contract,* Insurance, Performance and breach. *Interest.*

In a civil action brought by an administrator of an estate against a defendant
insurer contesting the alleged cancellation of a life insurance policy issued
by the defendant to the decedent, the defendant had no reasonable expecta-
tion of proving that the policy was canceled either unilaterally in ac-
cordance with the "free look" provisions of the policy or by mutual
consent: accordingly, the allowance of the plaintiff's motion for summary
judgment on a breach of contract claim was correct [767-768]; however,
the defendant's actions did not constitute a breach of the covenant of good
faith and fair dealing [768-769] or violate G. L. c. 93A or G. L. c. 176D
[769], and summary judgment in the defendant's favor on those counts
was appropriate.

In a successful action brought by a beneficiary of a life insurance policy to
enforce payment of benefits, the trial judge correctly computed interest on
the judgment at the rate of twelve percent per year, as required by G. L.
c. 175, § 119C, and G. L. c. 231, § 6C, rather than the "contract rate" of
three percent provided by the policy. [769-771]

CIVIL ACTION commenced in the Superior Court Department on
October 1, 1996.

The case was heard by *Charles T. Spurlock,* J., on a motion
for summary judgment.

*Walter J. Connelly* for the defendant.

*Howard S. Fisher* for the plaintiff.

DREBEN, J. On January 11, 1995, Sandra Caulfield (Sandra)
was killed by her husband, William, who thereafter committed
suicide. The principal question before us is whether prior to her

---

[1]Of the estate of Sandra M. Caulfield.

death Sandra effectively cancelled a $500,000 life insurance policy issued by the defendant insurer.[2] A judge of the Superior Court concluded that the policy was still in effect and allowed the plaintiff's motion for summary judgment on two counts of his complaint.[3] We affirm in part and reverse in part.

The policy, which was sent to Sandra on December 13, 1994, provided for cancellation without penalty during two periods.[4] Sandra subsequently received a "Notice of Withdrawal Right" which set forth an additional time period for cancellation.[5] All three, sometimes referred to as the right to "free look," required a return of the policy. Except for the argument in the margin,[6] which we reject, the defendant does not contest the judge's cor-

---

[2]After the defendant claimed the policy had been cancelled, the plaintiff, the administrator of Sandra's estate, brought this action.

[3]The complaint was in four counts: count I, breach of contract; count II, breach of implied covenant of good faith and fair dealing; count III, violation of G. L. c. 93A; and count IV, violation of G. L. c. 176D, § 3(9)(f), and c. 93A. The judge allowed the plaintiff's motion for summary judgment on counts I and II, and denied the motion as to counts III and IV. On the plaintiff's motion, and finding no just reason for delay, the judge ordered entry of judgment for the plaintiff on counts I and II under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

[4]The policy provided in relevant part, "RIGHT TO EXAMINE POLICY. You may examine this Policy and if for any reason you are not satisfied with it, you may cancel it by returning the Policy to us with a written request no later than: (a) 10 days after you receive it; (b) or 45 days after Part 1 of the Application was signed. All you have to do is take this Policy or mail it to our Home Office at 1600 Market Street, Philadelphia, Pennsylvania 19103, or to one of our offices or to the representative who sold it to you. If you do this, we will refund an amount equal to the premiums you paid under this policy."

[5]The "Notice of Withdrawal Right" sent to Sandra and dated December 19, 1994, provided that cancellation had to be undertaken no later than ten days from the date of the postmark of the notice.

[6]In the statement of facts portion of its brief, the defendant cites a part of the application which states that "this application consisting of Part I and Part II . . . will form the basis for and be part of any policy issued in accordance herewith." Relying on this language, it argues that Part I assumes the prior completion and signing of Part II — the health history portion of the application — which was not signed until November 30, 1994. From this it claims that the signing date was November 30, and not November 17, 1994, the day Sandra signed Part I of the application. Even if this contention could be viewed as argument, but see Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), it is without merit. As the motion judge ruled, the plain language of the policy, see note 4 supra, provides for cancellation forty-five days after the signing of Part I; no mention is made of Part II of the application.

rect conclusion that Sandra did not comply with any of the three "free look" provisions as she neither cancelled within the specified dates nor returned the policy.

1. The defendant's main contention is that there was a mutual agreement to cancel the policy. In the absence of a provision in the policy permitting unilateral action, a mere notification of an intent to cancel a policy is insufficient. *Copley* v. *Pekin Ins. Co.*, 111 Ill. 2d 76, 86 (1986). 2 Couch, Insurance § 31:47, at 63-64 (3d ed. 1995). There must be some affirmative action by the insurer "by way of an indorsement or otherwise" cancelling the policy. See *Benoit* v. *Fisher*, 341 Mass. 386, 389 (1960). The parties may, however, by mutual consent cancel the policy in ways other than those expressed in the policy. *Celi* v. *Pennsylvania Fire Ins. Co.*, 269 Mass. 225, 228 (1929). *O'Neil's Case*, 293 Mass. 41, 44 (1935). Couch, *supra*, § 31:47, at 62. See G. L. c. 175, § 187C, fifth par. See also *Berton* v. *Atlas Assurance Co.*, 203 Mass. 134, 138 (1909); *Flood* v. *Midland Natl. Life Ins. Co.*, 419 Mass. 176, 181 n.4 (1994).

In order to assess the argument that the policy was cancelled by mutual consent, a recitation of the uncontested facts is required. The first portion of our narrative is taken from affidavits of William Moffly and Michael Adler filed by the defendant in opposition to the plaintiff's motion for summary judgment.

Sandra and William Caulfield were clients of William Moffly, an employee of Fidelity Investments Institutional Services Company (Fidelity Investments). When informed that they were interested in purchasing life insurance, Moffly arranged an appointment for them with Michael Adler, an insurance representative employed by Fidelity Insurance Agency Inc. (Fidelity Insurance), a company licensed to sell life insurance for the defendant. Adler met with the Caulfields on or about November 17, 1994, and William and Sandra each applied for $500,000 life insurance. On December 8, 1994, a policy was issued to Sandra. About three weeks later, on December 30, Moffly received a telephone call from William stating that the Caulfields wanted to cancel their policies. Moffly told William "that he would have to send in a written request." Moffly, who was in Braintree, notified Fidelity Insurance in Boston of William's

telephone call. Also on December 30, Adler, informed by his office that the Caulfields wanted to cancel their policies, called William Caulfield. The latter stated he and Sandra could no longer afford the policies and said he wanted to cancel them. Adler "told him that there would probably be no problem with his policy because it had not yet issued and . . . told him someone would get back to him with regard to Sandra's." Adler notified Lesley Hutt, a case manager at Fidelity Insurance, of the substance of the conversation.

Lisa Glass, the keeper of the records for Fidelity Insurance, stated in a deposition that she never spoke to Sandra or William Caulfield as she was not permitted to speak directly to clients. She acknowledged receiving from Sandra a letter of cancellation which she forwarded, on January 9, 1995, to the person in charge of "free looks" at the defendant's office. Sandra's undated letter was addressed to "Ms. Glass," and stated:

> "In regards to the above policy #9020437 I wish at this time to exercise my free look provision and cancel the policy. Could you please return all premiums paid. Thank-you."

Although the defendant was advised of Sandra's death on January 12, 1995, the defendant did not, until January 16, 1995, indicate on its policy master record that the policy was "not taken." The defendant's supervisor of policy transactions acknowledged in her deposition that "anybody looking at that file . . . on January 12 would find that that policy was still outstanding." On January 16, 1995, the defendant sent Sandra a check returning the premium of $306.00, together with a statement "policy marked not taken."

To buttress its argument that Sandra's letter was effective to cancel the policy on the basis of mutual consent, the defendant relies on the following: (1) Lisa Glass's[7] deposition testimony that to the best of her knowledge a letter would suffice to "free look" the policy; (2) the statement of the supervisor of policy transactions in her deposition that all the company required for

---

[7] The attorneys at the deposition agreed she was testifying "individually" and not as a Mass.R.Civ.P. 30(b)(6), 365 Mass. 783 (1974), witness on behalf of Fidelity Insurance.

"surrender" of a policy was a signed letter from the insured; and (3) an affidavit from Rose Kiely, a policy transaction specialist of the defendant, who processed cancellations of policies, stating that the defendant had a practice of allowing a free look cancellation even if a few days late.[8]

The materials before the judge hearing the motion for summary judgment were insufficient to show either that the policy was cancelled by mutual consent or that, as the defendant also argues, there are genuine issues of material fact.[9]

The defendant's reliance on a practice of accepting late notification without submission of the policy as evidencing a mutual consent to cancel is misplaced. There is no evidence that such practices were communicated to Sandra by any person having authority regarding cancellation. Assuming that the statement of Moffly to William Caulfield that he should "send in a written request" implied that such a request would be sufficient to cancel, a tenuous assumption, and assuming that William was Sandra's agent, there is no showing that Moffly, an employee of Fidelity *Investments*, and not of Fidelity *Insurance*, was authorized to take any action or discuss procedures with respect to the cancellation of policies.

In order to rely on Moffly's statement, the defendant would have to sustain its burden of showing he had authority to bind

[8]Kiely's affidavit stated:

> "On or about January 3, 1995, I had a telephone conversation with Lisa Glass in which she told me that Sandra Caulfield wanted to freelook her policy although it was a few days beyond the delivery date. I told her that it would probably not be a problem, but she should get something in writing from the client. As a practice Provident grants a client's request for a free look cancellation if the client has missed the time period by a few days."

[9]Unless there is mutual consent to cancel in another manner, the practice of the defendant in accepting late payment or to effect cancellation without a return of the policy is not relevant. Where the cancellation "provisions of a policy are plainly and definitively expressed, the policy must be enforced in accordance with the terms. . . . Absent ambiguous contractual language in the policy, custom and practice evidence cannot be used to vary the provisions of the policy." *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. 422, 427 (1995) (citation omitted). Moreover, policy requirements as to cancellation are strictly construed. See *White* v. *Edwards*, 352 Mass. 655, 657 (1967).

the defendant. *Benoit* v. *Fisher*, 341 Mass. 386, 389 (1960). *Markel* v. *Travelers Ins. Co.*, 510 F.2d 1202, 1207 (10th Cir. 1975) (applying Kansas law). See 2 Couch, Insurance § 31:42, at 54 (3d ed. 1995) (indicating that even a broker who sells insurance does not by that fact have authority to cancel or modify). We also note, as previously mentioned, that after Moffly spoke to William Caulfield, Adler, of Fidelity Insurance, told Caulfield that someone would get back to him concerning Sandra's policy.

The defendant, the party asserting cancellation, also has the burden of showing the policy was cancelled. *Benoit* v. *Fisher*, 341 Mass. at 389. Couch, *supra*, § 30:19, at 26.

We now turn to *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991), for the standard to be applied by the judge in allowing summary judgment.

> "[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates, by reference to material described in Mass. R. Civ. P. 56 (c), [365 Mass. 824 (1974)], unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim."

In view of the materials before the judge, we conclude that the plaintiff has shown that the defendant has no reasonable expectation of proving that the policy was cancelled either unilaterally in accordance with the free look provisions of the policy or by mutual consent. Accordingly, the allowance of the plaintiff's motion for summary judgment on count I of the complaint was correct.

2. Although the judge in ruling on count II of the complaint concluded that there was a breach of the covenant of good faith and fair dealing, he did so "for the same reasons" that he determined there was a breach of contract by the defendant under count I. Not every breach of contract, however, is a breach of the implied covenant of good faith and fair dealing. The record does not support the conclusion that there was such a breach.

In view of the "cancellation" letter of Sandra which was received by the defendant before her death, its action in contesting payment, while ultimately proven incorrect, did not rise to bad faith or unfair dealing. The allowance of the plaintiff's motion on count II of the complaint must therefore be reversed and judgment entered for the defendant thereon.

3. The judge also made rulings on counts III and IV of the complaint, which alleged violations of G. L. c. 176D and c. 93A. He concluded that the defendant had asserted a valid reason for not paying the death benefit due under the policy "based on its belief that Sandra had cancelled her life insurance policy by letter before she died," and there was "no evidence that [the defendant] acted unfairly or deceptively" or used "extortionate tactics" in its attempt to settle the claim.

The judge denied the plaintiff's motion for summary judgment on these counts. Although the defendant did not seek summary judgment on counts III and IV, Mass.R.Civ.P. 56(c), unlike the cognate Federal Rule, specifically permits the rendering of summary judgment against the moving party where appropriate. In view of the judge's conclusions, which are amply supported by the materials before him, it is apparent that the defendant has sustained its burden of showing that proof of the elements constituting violations of G. L. c. 93A and G. L. c. 176D "is unlikely to be forthcoming." *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. at 714. Summary judgment for the defendant is appropriate on these counts and further proceedings would appear wasteful. See G. L. c. 231, § 125. See also *Gamache* v. *Mayor of North Adams*, 17 Mass. App. Ct. 291, 295 (1983). Accordingly, the matter is remanded to the Superior Court for the entry of judgment for the defendant on counts III and IV.

4. The defendant claims that the judgment was erroneous because interest was computed at the rate of 12 per cent per year and not at the "contract rate" of interest of 3 per cent provided by the policy.[10] The two relevant statutes, set forth in

---

[10]The provision referred to stated: "Payment of Insurance Proceeds. We will pay the Insurance Proceeds to the Beneficiary in a lump sum, unless a Payment Option has been selected. If the proceeds are payable in a lump sum,

the margin,[11] are G. L. c. 175, § 119C, and G. L. c. 231, § 6C. General Laws c. 175, § 119C, disposes of the defendant's claim, as the statute distinguishes between ordinary benefit payments and situations, such as this one, where "the beneficiary brings an action to enforce such payments and prevails." In the latter circumstances, interest shall be awarded in accordance with G. L. c. 231, § 6C. Even if we were to construe § 119C as incorporating the language in § 6C referring back to the contract rate of the policy (a doubtful and somewhat circular interpretation), the policy provision, see note 10, *supra*, is applicable to voluntary payments and administrative delay and does not contemplate a breach of the policy. See *Aetna Life Ins. Co.* v. *Braukman*, 70 F.2d 647, 651 (10th Cir.), cert. denied, 293 U.S. 578 (1934) (Colorado law); 12 Couch, Insurance § 179:20, at 34-35 (3d ed. 1998). The judge was correct in applying the 12 per cent rate.

The plaintiff, as well as the defendant, challenges the interest award. He claims that interest should be paid from the date demand was made. We do not reach this contention, as the

---

we will add interest to the amount of such proceeds for the period from the date of death to the date of payment. The amount of interest will be computed at the yearly rate of 3% or any higher rate declared by us or required by law."

[11]General Laws c. 175, § 119C, as amended by St. 1989, c. 615, provides:

> "Upon the death of an insured, the proceeds payable under any policy of individual life insurance which is in force on the date of death shall include the payment of interest at the rate for proceeds left on deposit with the insurer beginning thirty days after the death of the insured and shall not be payable until receipt by the insurer of proof of the insured's death. In the event the insurer does not pay interest on proceeds left on deposit with the insurer, the rate of interest shall be six per cent. If the beneficiary brings an action to enforce such payments and prevails, the court shall award interest in accordance with the provisions of section six C of chapter two hundred and thirty-one, in lieu of any interest payment contained in this section."

The relevant portion of G. L. c. 231, § 6C, as amended by St. 1982, c. 183, § 3, is as follows:

> "In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum, from the date of the breach or demand."

plaintiff has not docketed his cross appeal. See *Marshall* v. *Stratus, ante* 667, 669 & n.5 (2001).

5. *Conclusion.* The judgment in favor of the plaintiff is affirmed as to count I, and reversed as to count II. The matter is remanded to the Superior Court to enter judgment for the defendant on counts II, III, and IV.

*So ordered.*