## T.W. NICKERSON, INC. *vs.* FLEET NATIONAL BANK,[1] trustee,[2] & others.[3]

No. 07-P-554.

Barnstable. February 11, 2008. - January 5, 2009.

Present: CYPHER, ARMSTRONG, & RUBIN, JJ.

Further appellate review granted, 454 Mass. 1101 (2009).

*Contract,* Lease of real estate, Option, Implied covenant of good faith and fair dealing. *Real Property,* Lease, Right of first refusal. *Landlord and Tenant,* Renewal of lease. *Consumer Protection Act,* Lease, Unfair or deceptive act.

At a civil trial arising from the transfer of property that the plaintiff leased from a trustee to the trust beneficiaries and the beneficiaries' subsequent sale of that property to a third-party purchaser, the evidence was sufficient to prove that the beneficiaries committed a breach of the implied covenant of good faith and fair dealing, where a right of first refusal in the plaintiff's leases was in effect at the time of the sale and the beneficiaries did not provide the plaintiff with the notice required before selling the property, but rather precipitously sold the property immediately upon its acquisition without attempting to determine what their obligations were toward the plaintiff [444-448]; further, the trustee also committed a breach of the implied covenant of good faith and fair dealing, where its course of conduct (i.e., refusing to deal with prospective buyers of the property, instead instructing the beneficiaries to enter into the purchase and sale agreement themselves, and declining to respond to the plaintiff's efforts to exercise its right of first refusal or to get information about any change in ownership of the property) had the effect of destroying or injuring the ability of the plaintiff to receive the fruits of its right of first refusal contained in the leases [448-449]; moreover, the trustee's conduct was actionable under G. L. c. 93A, where the trustee was acting in a commercial context and its conduct was unfair or deceptive within the meaning of the statute [449-450]. At a civil trial arising from the transfer of property that the plaintiff leased from a trustee to the residual beneficiaries of the trust and the residual

---

[1]Fleet National Bank subsequently was purchased by Bank of America. No formal substitution of the parties appears in the record.

[2]Of the Theodore W. Nickerson Trust.

[3]Edmund Nickerson, Kenneth Nickerson, Theodora Burson, and Diana Lapham. A suggestion of death regarding Kenneth Nickerson was filed in the Superior Court, with a substitution made of Brenda M. Nickerson, executrix of his estate.

beneficiaries' subsequent sale of that property to a third-party purchaser, the evidence was sufficient to prove that the trustee violated the implied covenant of good faith and fair dealing with respect to the plaintiff's rights under its options to renew its leases, where, although the trustee's delays in negotiating and then approving the lease renewals did not interfere with the plaintiff's rights under the options to renew, the trustee's termination of the trust upon the death of the original beneficiary injured the plaintiff's rights by delaying the signing of the renewals until after the residual beneficiaries had sold the property [450-451]; further, the trustee's conduct amounted to an unfair or deceptive act or practice within the meaning of G. L. c. 93A [451-452].

CIVIL ACTION commenced in the Superior Court Department on July 9, 2002.

The case was heard by *Regina L. Quinlan,* J., and motions for amended findings and for reconsideration were also heard by her.

*Thomas F. Sullivan (Hrant H. Russian* with him) for the plaintiff.

*Peter S. Farber* for Edmund Nickerson & others.

*Robert A. Bianchi* for Fleet National Bank.

RUBIN, J. This case involves a dispute about property in Chatham. We summarize the facts, relying on the findings made by the Superior Court judge following a jury-waived trial, and supplementing where necessary by undisputed record evidence.

A. *Procedural background.* T.W. Nickerson, Inc. (plaintiff), is a Massachusetts corporation that operates a "stump dump" business on the subject property.[4] The property on which the plaintiff operates its business was owned by defendant Fleet National Bank (Fleet), as trustee of the Theodore W. Nickerson Trust (trust). Lillian Nickerson, who was the wife of Theodore W. Nickerson, was the original beneficiary of the trust, and the children of Theodore,[5] defendants Edmund Nickerson, Kenneth Nickerson, Theodora Burson, and Diana Lapham, were the remainder beneficiaries (collectively, beneficiaries). The plaintiff brought this suit after the subject property was transferred to the

---

[4]The plaintiff explains that it "charges a fee to accept trees and other debris cleared from land by developers. [It] then processes this material and sells it on the open market as loam, gravel, and wood chips."

[5]We use the first names of the Nickersons for ease of reference.

beneficiaries and then sold to a third-party purchaser. At the time of sale, the plaintiff's leases on the property had not been renewed.

In its second amended six-count complaint, the plaintiff alleged that both Fleet and the beneficiaries breached the implied covenant of good faith and fair dealing and that the plaintiff consequently suffered injury in regard to its rights under an option to renew each of two leases it held on the property; that both Fleet and the beneficiaries breached the implied covenant of good faith and fair dealing and that the plaintiff consequently suffered injury in regard to its rights under a right of first refusal contained in each of those leases; and that both Fleet's and the beneficiaries' conduct constituted unfair and deceptive acts or practices, in violation of G. L. c. 93A.

After a bench trial, a Superior Court judge entered findings of fact, rulings of law, and an order for judgment. The judge found Fleet liable for breach of the implied covenant of good faith and fair dealing with respect to the plaintiff's rights under the option to renew the leases because of Fleet's lack of diligence throughout the lease renewal process, and found for both Fleet and the beneficiaries on the plaintiff's other claims. The judge required that, "[o]n the issue of damages," the plaintiff submit "an affidavit detailing the damages claimed" and that if Fleet disputed the amount of damages, she would hold a hearing.

Fleet filed a motion for amended findings, and the plaintiff filed a motion for reconsideration. The plaintiff also filed several affidavits as to damages, and the beneficiaries filed a memorandum in opposition to the plaintiff's claim for damages; Fleet filed a motion to strike the plaintiff's affidavits. After hearing, the judge reversed her previous conclusion with respect to the plaintiff's successful claim against Fleet, but retained the remaining rulings. This appeal by the plaintiff is from the resulting judgment. Some background is in order.

B. *Factual background.* 1. *The leases.* In 1991, Theodore sold the plaintiff corporation to his nephew Donald F. Nickerson, and in 1993, Donald sold all of the stock to Steven T. Clark, who was related to the Nickersons through his mother. As a result, Clark became the president and treasurer of the plaintiff. In 1993, Fleet and the plaintiff executed two leases, a

"Business Premises Lease" and a "Stump Dump Commercial Lease." The business premises lease covered two parcels of land known as lot 5, which is itself part of a piece of land referred to as parcel A. The stump dump commercial lease covered another piece of land referred to as parcel B.

Each lease gave the plaintiff the right to use the property described from July 1, 1991, through June 30, 2001. Both leases provided the plaintiff with an option to renew for an additional ten-year term "at a rental to be agreed upon between the parties." The leases both provided that if the parties could not "agree upon a rental, then [the] same shall be determined by arbitration," and provided a mechanism for each side to choose an arbitrator, with the third chosen by the first two. The leases further stated that:

> "This option to renew shall be deemed to have been exercised upon receipt by LESSOR from LESSEE no later than six months prior to expiration of the term of said lease written notice of LESSEE's intent to exercise said option. It is agreed that negotiation regarding a new rental amount will commence upon receipt of said written notice from LESSEE. In the event LESSOR and LESSEE have not agreed upon a new rental amount in accordance with the terms of this paragraph by the expiration date of said lease it is agreed that LESSEE will pay to LESSOR the current rental amount until a new amount has been agreed upon. It is also agreed that said new rental amount will be retroactive to the date of the commencement of the renewed lease and that at the time the amount is determined a one time adjustment will be made between the current rental amount and the new rental amount."

The leases also each contained similar language regarding a right of first refusal to purchase:

> "The LESSOR grants to the LESSEE the right of first refusal to purchase the entire leasehold premises at a price equal to any bona fide offer received by the LESSOR for the property, said right of first refusal to expire upon the termination of this lease. In the event premises are conveyed as part of a larger parcel within which is included the

leasehold premises, the LESSOR grants to the LESSEE the right of first refusal to purchase the entire parcel at a price equal to any bona fide offer received by the LESSOR for the property, said right of first refusal to expire upon the termination of this lease. In the event of a sale of the leasehold premises to a party other than LESSEE said sale shall be subject to the leasehold interest hereby created. The LESSOR shall notify the LESSEE by Certified Mail, Return Receipt Requested, of any bona-fide offer and the LESSEE shall have thirty (30) days from receipt thereof in which to notify the LESSOR of its intent to exercise its right of first refusal as set forth above. The LESSEE shall then have sixty (60) days subsequent thereto in which to purchase said property in accordance with the terms of any said bona-fide offer."

The leases provided that their terms ran with the premises, and "that they shall extend to and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto, and any and all persons, firms and corporations holding through or under them, the same as if they were in every case named and expressed."

2. *Clark's offer.* In 2000, Clark made an offer to purchase the subject property for $300,000[6]: $30,000 cash and a note for the balance of $270,000. In June, 2000, Fleet's attorney, Russell Haddleton, sent Clark's attorney a draft purchase and sale agreement, but Clark did not sign it because of a title issue involving the land. In late 2000, a new trust officer at Fleet, Timothy Hannon, was assigned to the trust. He met with Clark, who told him the beneficiaries had agreed to the sale price of $300,000, but that there was a title problem relating to the description of the premises. Hannon placed a memorandum on file at Fleet describing the oral agreement between Clark and the beneficiaries. He then wrote to Edmund, one of the remainder beneficiaries, who was handling the affairs of his mother Lillian, stating that Fleet was concerned about the purchase price, and that it might need the beneficiaries "to execute some type of hold harmless agreement" to protect Fleet, prior to selling the property. Edmund sent Hannon an impatient electronic mail message (e-mail) that

---

[6]The trial judge made no finding concerning the precise scope of the property Clark sought to purchase; it is undisputed that it included parcel B and lot 5.

said, in part, "You know it amazes me the lawyer[s] are having such a problem with the sale to [Clark]." Edmund said that there should be no problem with creating a deed, and that "[a]s for the selling price, the [beneficiaries] will be willing to sign whatever papers are needed to keep Fleet harmless. You have been informed why it is important to expedite the sale. (Age and liability.)"

Clark also spoke with Edmund to get his assistance with the title problem. Edmund told him that in his opinion there was no such problem and that Clark and Fleet should get going. Clark then called Hannon, told him about the conversation, and requested a meeting of all concerned.

By letters dated November 9, 2000, from the plaintiff's attorney, Hrant Russian, the plaintiff timely exercised its right to renew the leases. Each letter said the notice was being given pursuant to the respective lease, and each letter said, "[I]f no agreement is reached [as to the rental amount], then, we should proceed to [arbitration]."

Attorney Haddleton hired a title examiner to confirm the record title. There were questions about possible defects in the title because of vague deed descriptions and references to boundary markers that no longer existed. Meanwhile, Edmund sent an e-mail to Hannon telling him not to discuss lease renewal with Clark until May, 2001 (i.e., one month before the expiration date of the leases), because he thought ultimately Clark was going to buy the property rather than renew the leases.

In December, 2000, Attorney Russian sent a draft purchase and sale agreement to Attorney Haddleton. While Haddleton was informed that Clark would take the property if the title search confirmed that clear title could be taken through adverse possession, Fleet never acted on the draft purchase and sale agreement.

Hannon told Clark in February of 2001 that the terms and conditions of the leases, including the rights of first refusal, would be extended until the new leases had been negotiated. On May 18, 2001, there was a meeting of Clark, Attorney Russian, Hannon, Attorney Haddleton, Edmund, and the title examiner to discuss the title issues. The group agreed to pursue ownership through adverse possession, and Edmund agreed to assist in getting required affidavits. The group also discussed the leases,

with Hannon offering Clark a ten-year extension with a ten percent increase in rent. After this meeting, in anticipation of the sale, Clark purchased additional equipment for the business.

In the fall of 2001, Fleet hired Attorney George de Verges to represent it in lease negotiations with the plaintiff. For the rest of 2001 and well into 2002, the attorneys for Fleet and for the plaintiff exchanged numerous drafts of the proposed leases. In these negotiations, the main issues were the rental amount and the extent of the leasehold premises; the plaintiff wanted to increase the property within the leasehold, while Fleet and the beneficiaries did not.

Finally, on April 3, 2002, Hannon submitted proposed leases to Fleet's real estate administration committee (committee) that called for a five percent annual increase in rent; the judge found that proposed leases were signed by Clark in February, 2002, and no party contests that finding. The committee, rather than approving them, tabled the leases until its next meeting, and asked Hannon to get an appraisal of the fair rental value of the leasehold premises.

3. *Lillian's death.* On April 11, 2002, Lillian died. Under the terms of the trust instrument, "Upon the death of the last survivor of the Grantor and his wife, the Trustee shall divide the trust assets into as many separate, equal trusts as there shall be children of the Grantor then living and children of the Grantor then deceased leaving issue surviving them." Fleet, however, decided to terminate the trust.[7] Indeed, by a letter to Edmund dated April 16, 2002, Fleet stated that the trust "is now due to terminate."

---

[7]An internal e-mail from Ralph Nixon, a relationship manager at Fleet, sent to Hannon on April 4, 2002, states that he and Fleet vice-president and relationship manager Geoffrey Reuland "concluded that maybe [Fleet] should consider resignation" as trustee in light of the concern about the title issues and allow the beneficiaries to dispose of the property as they wished. Further, although the record does not provide the context, on April 11, 2002, Reuland wrote to Hannon, "Maybe I am just too cautious, but I don't like the smell of this. If the beneficiaries think there is an environmental liability surrounding the property, and if there is, I believe they are going to run for the hills and try to leave [Fleet] holding the bag. . . . Maybe there is something we should do preemptively." Although the two e-mails are not linked by anything in the record, Edmund's initial e-mail to Hannon had cited "liability" as a reason that a quick sale was needed.

Immediately after Lillian's death, Hannon told Clark, in response to his inquiry, that everything was now on hold. In an internal e-mail about the lease renewal, dated April 16, 2002, Hannon told Fleet vice-president and relationship manager Geoffrey Reuland that, although the proposal submitted to the committee had provided for a five percent annual increase in rent, with respect to the rental amount, "[a]t this point . . . the [beneficiaries] and [the plaintiff] are on [their own]."

At Lillian's memorial service in May, 2002, Clark spoke with Edmund about buying the property, and Edmund said that he would accept $200,000, but the sale had to be quick and title taken "as is." In addition, Edmund stated that it would be a requirement that his brother Kenneth Nickerson be permitted to continue to occupy his farm located within lot 5.

4. *The Bridgewater offer.* In May, 2002, another tenant of the trustee, Anthony Bridgewater, contacted Fleet about a leaky roof in his building. Bridgewater obtained a repair estimate of $15,000. Fleet told Bridgewater that it did not want to be involved, and that the property was being sold to the plaintiff. Later, Bridgewater learned from Kenneth that the property was going to be sold for $200,000. Bridgewater offered to buy the property for $400,000.

Bridgewater's attorney drafted a purchase and sale agreement for Bridgewater and his wife to buy the property. It called for a cash sale with no contingencies. The Bridgewaters were willing to take title "as is."

Prior to signing the purchase and sale agreement, Edmund contacted Hannon about the offer to purchase. Hannon told Edmund that Fleet, the legal owner of the property, would not be getting involved and that the beneficiaries should handle the matter themselves. A purchase and sale agreement was signed by the Bridgewaters and by the beneficiaries, who were not then the legal owners of the property, on May 30, 2002.

On June 2, 2002, Clark met with Bridgewater, who told Clark that he and his wife were buying the property for $400,000 "as is." At no time did either Fleet or the beneficiaries provide the plaintiff with the written notice described in the lease provisions regarding the plaintiff's right of first refusal. No later than June 19, 2002, Fleet was given a copy of the purchase and sale

agreement, which was delivered to its attorney, de Verges. On that date, de Verges sent a letter to Hannon and to Reuland telling them that he had a copy and offering to send it to them.

While the plaintiff did not receive the written notice of the Bridgewater offer as described in the leases, it did not rest on its rights. Alerted by Clark's conversation with Bridgewater, on June 25, 2002, Attorney Russian wrote to Hannon stating in relevant part:

> "My client, [the plaintiff,] has been informed that [Fleet] as Trustee of the [trust] has received a bona fide offer for the purchase of the leasehold premises, both the Stump Dump and the Business area from a third party.

> "Under both leases, the Stump Dump Lease and the Business Premises Leases, my client had a RIGHT OF FIRST REFUSAL . . . .

> "If there is a bona fide offer, my client takes the position that [Fleet] or to whomever the bona fide offer was given, had the obligation by certified mail, return receipt requested, to send all of the terms and provisions of the bona fide offer to my client within thirty (30) days from its receipt, and, thereupon, my client has sixty (60) days in which to purchase the properties in accordance with the terms of said bona fide offer.

> "Therefore, kindly provide me or my client by certified mail, with a copy of all of the terms of any bona fide offer . . . .

> "My client intends to enforce all of his rights, both to the renewal leases and its right to purchase.

> "If [Fleet] is no longer Trustee and complete distribution has been made of the property, kindly provide me with reasonable effectuation of such distribution; otherwise, I shall assume [Fleet] is still the holder of title and manager of the properties."

Fleet did not respond to this letter, although Hannon apparently forwarded a copy to Edmund. In a letter dated June 29, 2002, Edmund wrote to Hannon:

"Received copy of the letter from [Attorney] Russian that you sent me along with the short note on your card. I am perplexed in your remarks since I called both you and Geoff [Reuland] concerning the offer on the Trust property. [Fleet] still holds the property yet you and they did not want anything to do with the offer. It seems to me that [Fleet] had and still do have the responsibility to handle [Clark's] leases and option to buy as you have not for some reason seen fit to settle the Trust by presenting a deed to the heirs.

"[Fleet] had the responsibility to renew the lease over a year ago. Also since you knew about the offer [Fleet] once again should have notified [Clark] as his *old Lease* stated. I don't think he [Clark] could come up with amount needed anyhow. For three years he couldn't or wouldn't buy the property for much less money.

"At any rate [the beneficiaries have] been dealing with the supposed buyer as per instructed by [Fleet] knowing we have no authority without a Deed. Now it looks like [Fleet] will have to straighten out the matter with [Clark's] lawyer!!? I would appreciate a copy of any letter you might send to [Attorney] Russian in regard to his questions."

Although Hannon was aware that Fleet, through its attorney, de Verges, had received a copy of the signed purchase and sale agreement, he responded to Edmund in an e-mail dated July 3, 2002, writing:

"A couple of points. While it is true you did phone and state that you had an offer from another buyer I never received a copy. [Fleet] as a matter of policy does not respond to verbal offers. At the same time we discussed the distribution of the property to [the beneficiaries] and that [Fleet] would not be selling directly to a buyer. I believe the real issue here is a matter of timing. As mentioned in my message of this morning we hope to complete the transfer to [the beneficiaries] hopefully by the end of next week at the latest.

". . .

"Regarding [Clark's] lawyer's letter we have decided not to respond. Frankly, we have wasted enough time and trust money with him. [Fleet] is not obligated to present him a copy of the offer because we are not in possession of one."

There was evidence at trial that Edmund asked Bridgewater's attorney, Joseph D'Elia, about the right of first refusal. D'Elia told Edmund it had expired. However, later in the day on July 3, 2002, in a further e-mail exchange with Edmund, Hannon wrote to Edmund: "[The plaintiff] retains the right to renew even if the leases have expired. That includes the Right of First Refusal."

5. *The delivery of the deed and the closing with the Bridgewaters.* On July 9, 2002, a representative of Fleet delivered the deed for the subject property to Edmund. On July 10, 2002, the beneficiaries and the Bridgewaters closed on the property. No notice of the Bridgewaters' bona fide offer ever was sent to the plaintiff, nor was it given the opportunity to purchase the property on the terms set out in that offer. The plaintiff subsequently brought this suit.

After the closing, the plaintiff and the Bridgewaters held discussions about the still-not-signed leases. The Bridgewaters were willing to accept the leases negotiated by Fleet, with two exceptions: they wanted the plaintiff to remove the debris that had accumulated on the stump dump over the years, and they wanted to be dismissed with prejudice from the instant litigation. In January, 2003, new leases consistent with these terms were executed, as was a stipulation of dismissal of the Bridgewaters with prejudice.

C. *Discussion.* Our standard of review is well established. We accept the trial judge's findings of fact unless they are clearly erroneous. See *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004). The judge's legal conclusions, we review de novo. *Ibid.*

We turn first to the right of first refusal. To begin with, we agree with the judge that the right of first refusal was still in effect through the date of the closing with the Bridgewaters. Hannon orally extended the terms of the leases through the negotiations, which were not completed by the time of the sale of the

property to the Bridgewaters. Neither lease required modifications to be made in writing, and the Statute of Frauds does not bar enforcement of an oral extension of this kind.[8] See *McKinley Invs., Inc.* v. *Middleborough Land, LLC*, 62 Mass. App. Ct. 616, 619-621 (2004).

We conclude that the beneficiaries failed to abide by the terms of the right of first refusal. Under the terms of the leases, by which they became bound upon their receipt of the deed on July 9, 2002, the beneficiaries were required to "notify the [plaintiff] by Certified Mail, Return Receipt Requested, of any bona-fide offer and [the plaintiff] shall have thirty (30) days from receipt thereof in which to notify the LESSOR of its intent to exercise its right of first refusal." The beneficiaries themselves state that "there is no question in this case that the Bridgewaters' offer was bona fide, and was submitted to and accepted by the beneficiaries on May 30, 2002."

There also is no question that the beneficiaries did not provide the plaintiff with the notice required of them as lessor under the right of first refusal before selling the property. The beneficiaries argue that the notice Clark received from Bridgewater on June 2, 2002, was sufficient. But all Bridgewater said to Clark was that he was purchasing the property for $400,000.

Given the terms of the leases, this notice cannot suffice. To begin with, when a contract concerning real property calls for written notice, oral notice is not sufficient. See, e.g., *Computune, Inc.* v. *Tocio*, 44 Mass. App. Ct. 489, 491-493 (1998). But even if it were, in the context of a right of first refusal, the party with the option must be provided with all the terms of the offer. "Upon notice of a bona fide offer to purchase, the right of first refusal ripens into an option to purchase the property at the price and otherwise on the terms stated in the offer." *Frostar Corp.* v. *Malloy*, 63 Mass. App. Ct. 96, 103 (2005). "The owner's obligation under a right of first refusal is to provide the holder of the right seasonable disclosure of the terms of any bona fide third-

---

[8]Fleet concedes that both the right of first refusal and the right under the options to renew remained in effect at all relevant times. The beneficiaries argue in passing that there was no consideration for the modification of the leases. There was: the plaintiff agreed to continue negotiating, to forgo immediate invocation of the arbitration clause, and to continue to pay rent.

party offer." *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 382-383 (2004). Because the holder of the right must meet the terms and conditions of the third-party offer, it "cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision. In most transactions, . . . the seller receives a *written* offer to purchase setting forth the terms and conditions of the offer. The preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror." *Gyurkey* v. *Babler*, 103 Idaho 663, 666 (1982), citing *Sports Premiums, Inc.* v. *Kaemmer*, 42 Colo. App. 172 (1979), and *Duane Sales, Inc.* v. *Carmel*, 49 N.Y.2d 862 (1980).

The beneficiaries urge that the plaintiff was on "constructive notice" of the Bridgewaters' offer because of the conversation between Clark and Bridgewater. *Sudbury* v. *Scott*, 439 Mass. 288, 297 (2003). The beneficiaries are correct that the principles articulated in *Scott*, which involved a statutorily created municipal right of first refusal under G. L. c. 61A, § 14, are applicable in this contract case. See *id.* at 297 n.12 ("Common-law principles apply to a right of first refusal created by statute"). But the doctrine of constructive notice has no application here. Under that doctrine, the holder of the right of first refusal can "not wait indefinitely to assert its rights," if it seeks to obtain the equitable remedy of specific performance. See *Stone* v. *W.E. Aubuchon Co.*, 29 Mass. App. Ct. 523, 527 (1990). Rather, at least when it learns of the sale to a third party, it has "a reasonable time to inquire into the terms of the purchase and to exercise its right." *Ibid.*

Here, three weeks after Clark learned of the Bridgewaters' offer, his attorney wrote to the title owner of the property asking to be provided with the actual terms of that offer. Not only did Fleet receive that request, it forwarded it to Edmund, one of the beneficiaries, who therefore had actual notice of the request. That Clark had heard secondhand of some of the terms of the offer cannot in such circumstances excuse the beneficiaries' failure to provide him with the notice required by the leases.[9]

---

[9]The beneficiaries' argument that the plaintiff was required to tender the

The beneficiaries thus breached the plaintiff's contractual right of first refusal. The plaintiff, however, has alleged not a breach of the contractual right of first refusal, but a breach of the implied covenant of good faith and fair dealing. In Massachusetts, every contract contains that covenant. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991). The covenant is "an 'implied' term or condition of the contractual arrangement," *Cadle Co.* v. *Vargas*, 55 Mass. App. Ct. 361, 366 (2002), "that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976) (quotation omitted).

"Not every breach of contract . . . is a breach of the implied covenant of good faith and fair dealing." *Nagel* v. *Provident Mut. Life Ins. Co. of Philadelphia*, 51 Mass. App. Ct. 763, 768 (2001). But the beneficiaries' precipitous act of selling the subject property immediately upon its acquisition, particularly where they had been put on notice by Fleet that the right of first refusal might still be in force, without even attempting to

---

purchase price to the Bridgewaters after the beneficiaries conveyed to them is without merit. A plaintiff in such circumstances is "not obliged to tender performance before suit." See *Tucker* v. *Connors*, 342 Mass. 376, 383 (1961). Had the plaintiff brought suit against the Bridgewaters for specific performance, which it was entitled to do, see *Sudbury* v. *Scott*, 439 Mass. at 297, the Bridgewaters' interests would have been "adequately protected by the conditional form of the final decree, which requires conveyance only upon payment of the price." *Tucker* v. *Connors*, *supra.* Nor was the plaintiff required to tender to Fleet or to the beneficiaries the purchase price. The property had been conveyed by Fleet and then by the beneficiaries before the plaintiff received notice of the terms and conditions of the Bridgewaters' offer. It is well established that tender is not required where it would be futile. *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. 199, 202 (1985). See *Tucker* v. *Connors*, *supra* (optionee excused from taking action to be ready to make an immediate tender where the defendant had conveyed the property, since by the time of conveyance, the defendant "in effect had repudiated any obligation to [the optionee] and would not convey to him unless a court compelled him to do so"). See also *Erin Food Servs., Inc.,* v. *Derry Motel, Inc.*, 131 N.H. 353, 362 (1988) (Souter, J.) (noting the "rule excusing formal tender to a party whose repudiation of a contract has previously indicated that tender would be a useless act"). The financial ability of the party claiming breach of a right of first refusal to pay the purchase price is a material issue in an action for damages caused by that breach. See *Hurd* v. *Cormier*, 358 Mass. 736, 738-739 (1971); *Kanavos* v. *Hancock Bank & Trust Co.*, *supra.* None of the defendants, however, has argued that the plaintiff lacked that ability.

determine what their obligations were toward the plaintiff (beyond apparently inquiring of the attorney for the party who made the bona fide offer to purchase the property), amounts to such a breach.[10]

The liability of Fleet is a more complex matter. The lease provisions refer to a "bona fide offer received by the LESSOR." While Fleet was the legal owner of the property, it was required to notify the plaintiff of any such offer. When the beneficiaries of the trust told Fleet, their fiduciary and the legal owner of the property, that Bridgewater had made an offer to purchase the subject property, Fleet refused to deal with the prospective buyers. Instead, it instructed the beneficiaries to enter into the purchase and sale agreement themselves. Fleet then actually received a copy of the signed purchase and sale agreement that, at Fleet's instruction, named the beneficiaries as sellers rather than Fleet.

At the same time, the plaintiff, alerted to the possibility of an offer, contacted Fleet and sought to exercise its right of first refusal, to obtain a copy of the offer, or to get information about any change in the ownership of the subject property. Fleet deliberately declined to respond.

Fleet urges that it did not breach the right of first refusal because "[t]here is no evidence, that at any time, Fleet was presented with an offer to purchase from Bridgewater." Fleet claims, "[T]he Bridgewater offer as reflected in the purchase and sale agreement was made to the [beneficiaries], as sellers." Fleet argues that its obligations under the right of first refusal were not triggered either by the beneficiaries informing it of Bridgewaters' oral offer, or by its receipt of the subsequent written offer made to the beneficiaries, because in neither case did Fleet have an enforceable offer that it could accept. "[T]he right that a person with a right of first refusal has to choose either to purchase or not to purchase cannot be exercised before the owner has received a bona fide and enforceable (written) offer from a third party." *Roy* v. *George W. Greene, Inc.,* 404 Mass. 67, 70 (1989), *S.C.,* 408 Mass. 721 (1990).

---

[10]We agree with the beneficiaries that they are not subject to a claim under G. L. c. 93A, as their actions were "in no way undertaken in the ordinary course of a trade or business." *Lantner* v. *Carson,* 374 Mass. 606, 608 (1978).

However, as we noted, *supra*, the plaintiff has not alleged that Fleet's acts amounted to a breach of the right of first refusal. Rather it alleges that they amounted to a breach of the implied covenant of good faith and fair dealing, and to unfair and deceptive acts or practices in violation of G. L. c. 93A.

We therefore assume without deciding that Fleet did not breach the right of first refusal. Regardless, Fleet's conduct did violate the implied covenant of good faith and fair dealing by interfering with the plaintiff's right of first refusal under the leases. Fleet's course of conduct had "the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Druker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. at 385 (quotation omitted). When alerted by the beneficiaries about the existence of a prospective good faith purchaser, Fleet sought to avoid its responsibility to the plaintiff under the leases by which it still was bound, telling the beneficiaries that it would have nothing to do with the offer even though it remained the legal owner of the property (indeed, one with a fiduciary obligation to those beneficiaries). Had it not done so, Fleet's obligations under the right of first refusal certainly would have been triggered, and it would have been required to give the plaintiff the opportunity to exercise that right. When the plaintiff, alerted to the possibility of an offer, sought to exercise its rights under the leases, Fleet, already having told the beneficiaries it would not be involved, did not respond, even to tell the plaintiff of the actions it had taken. This worked a further injury to the plaintiff with respect to the right of first refusal contained in the leases.[11]

Likewise, Fleet's conduct was actionable under G. L. c. 93A.

---

[11]Contrary to Fleet's contention, the plaintiff's settlement with the Bridgewaters does not extinguish its rights with respect to the defendants here. Although the plaintiff might have sought specific performance against the Bridgewaters, the plaintiff's rights against the prior owners of the property are independent of its rights against a new purchaser. The plaintiff also could have sought specific performance against the defendants notwithstanding Fleet's conveyance to the beneficiaries and the beneficiaries' conveyance to the Bridgewaters, see *Stone* v. *W.E. Aubuchon Co.*, 29 Mass. App. Ct. at 526 (lessee may enforce the option through an action for specific performance against the grantor notwithstanding a completed sale to a third party), or, as it chose to do in filing this action, damages. See, e.g., *Connihan* v. *Thompson*, 111 Mass. 270, 271 (1873) ("the remedy in equity, by compelling specific performance, and that at law in damages for the breach, are both in affirmance of the contract. They are alternative remedies, but not inconsistent").

Fleet, as trustee, was acting in a commercial context, and was therefore subject to the strictures of c. 93A. See *Quinton* v. *Gavin*, 64 Mass. App. Ct. 792, 798-799 (2005). Fleet's course of conduct with respect to the right of first refusal here was unfair or deceptive within the meaning of the statute. Fleet's argument to the contrary consists solely of an assertion that, in contrast to the trial judge's factual finding, Edmund did not contact Fleet's trust officer Hannon about the offer prior to signing the purchase and sale agreement. The judge's finding, however, is supported by the evidence.

The plaintiff also claims a violation of the implied covenant of good faith and fair dealing with respect to its rights under the options to renew the leases. Its argument in essence is that Fleet's delay in negotiating and then approving the lease renewals was not an act of good faith, and that it had substantial consequences for the plaintiff because, among other things, when the plaintiff ultimately renewed its leases with the Bridgewaters it had to expend a substantial sum to clear the property of debris.[12]

We agree with the trial judge that none of Fleet's actions prior to Lillian's death breached the implied covenant of good faith and fair dealing in a way that interfered with the plaintiff's rights under the options to renew. Although the renewal provisions did call for arbitration in the event a new rent could not be agreed upon, the renewal negotiations broadened to encompass other terms, including some sought by the plaintiff. Each party was responsible for some of the delay, and none of the facts found by the trial judge suffices to demonstrate bad faith delay on Fleet's part.

The story, however, is different after Lillian's death on April 11, 2002. Eight days before Lillian's death, Hannon submitted to the committee at Fleet renewal leases with the plaintiff. Clark

---

[12]As the trial judge noted, the delay of which the plaintiff complains took place while Fleet was the legal owner of the subject property. None of the actions alleged to have been undertaken by the beneficiaries during that period was undertaken in bad faith, and we do not understand the plaintiff to be claiming that the beneficiaries breached the implied covenant of good faith and fair dealing with respect to the lease renewals during the brief time during which they were legal owners of the property. The trial judge therefore was correct that the beneficiaries did not breach the covenant in a way that interfered with the plaintiff's rights under its options to renew the leases.

already had signed draft leases. The committee requested an appraisal before agreeing to the leases.

After Lillian's death, however, Fleet took no action to complete the process. As the trial judge found, "Fleet took the position that the trust would be terminated and that, as trustee, its authority was to wind down the affairs of the trust and distribute the corpus to the beneficiaries."

The plaintiff argues that Fleet's actions were not authorized by the trust instrument and therefore were wrongful. It is correct. The trust instrument does not authorize the trustee in these circumstances to terminate the trust. Rather, it provides that upon Lillian's death, "the Trustee shall divide the trust assets into as many separate, equal trusts as there shall be children of the Grantor then living and children of the Grantor then deceased leaving issue surviving them." The instrument indicates that the trustee, Fleet, "shall" continue to act as trustee of these trusts.

Distribution of the trust assets to the beneficiaries and termination of the trust therefore was improper.[13] The failure of Fleet, a fiduciary, to abide by the trust instrument authorizing it to act is sufficient to show the requisite lack of good faith. Fleet's conduct caused the signing of the lease renewals to be delayed by a full three months, i.e., until after the conveyance of the subject property first to the beneficiaries, then to the Bridgewaters. It thus injured the plaintiff with respect to its rights under the lease renewal provisions, and was a breach of the implied covenant of good faith and fair dealing. Such a breach may also amount to an

---

[13]The trial judge hypothesized that Fleet distributed the proceeds and terminated the trust pursuant to a provision of the trust instrument providing that, with respect to the trusts for the benefit of the living children of the grantor, three of the beneficiaries (Theodora Burson, Edmund, and Diana Lapham) "may, from time to time, by notice in writing to the Trustee, request distributions of principal, including all thereof." The instrument further provides that "[i]n the event that the trust corpus is entirely withdrawn, the trust for that beneficiary shall terminate." Even leaving aside the fact that the trust instrument does not give Kenneth the power to make such requests, the quoted language refers to the separate trusts for the benefit of the children, i.e., the trusts that never were created, not to the family trust that Fleet terminated. Nonetheless, the record includes a letter requesting a distribution that Fleet prepared for at least one beneficiary and, in a mailing dated June 20, 2002, sent to the beneficiary; the cover letter stated that "we should have a formal request on you for distribution of your trust share" and asked him to sign and return the request letter.

unfair or deceptive act or practice resulting in liability under G. L. c. 93A. See *Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995). We conclude that the breach here does.

D. *Disposition.* So much of the judgment as dismisses the plaintiff's claims against Fleet for violation of the implied covenant of good faith and fair dealing regarding its rights under the options to renew and the rights of first refusal, and for violation of G. L. c. 93A, is reversed. In addition, so much of the judgment as dismisses the plaintiff's claim against the beneficiaries for violation of the implied covenant of good faith and fair dealing regarding the rights of first refusal is reversed. The case is remanded for further proceedings, and an assessment of damages, consistent with this opinion. In all other respects, the judgment is affirmed.

*So ordered.*