T.W. NICKERSON, INC. *vs.* FLEET NATIONAL BANK, trustee,[1]
& others.[2]

Barnstable. January 4, 2010. - April 16, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Contract,* Lease of real estate, Option, Implied covenant of good faith and fair
dealing. *Real Property,* Lease, Option, Right of first refusal. *Landlord and
Tenant,* Renewal of lease. *Consumer Protection Act,* Lease, Unfair or
deceptive act.

In a civil action arising from the transfer of property that the plaintiff leased
from a trustee to the trust beneficiaries and the beneficiaries' subsequent
sale of that property to a third-party purchaser, the evidence was sufficient
to prove that the trustee did not commit a breach of the implied covenant
of good faith and fair dealing regarding a right of first refusal in the
plaintiff's leases, where the trustee, after determining that the trust would
be terminated upon the death of the holder of beneficial title, had neither
the power nor the intent to sell the property, especially given that the third
party's offer to purchase the property was made not to the trustee but to
the trust beneficiaries; where the trustee had no duty to police the
beneficiaries' actions after giving them notice that the plaintiff's right of
first refusal remained in effect; and where there was no evidence that the
trustee's motive in terminating the trust was to negatively affect the rights
of the plaintiff under the leases [569-575]; similarly, given that the trustee's
power to renew the leases was limited once it had determined that the trust
would be terminated, there was no basis on which to conclude that the
trustee had committed a breach of the implied covenant of good faith and
fair dealing regarding the plaintiff's rights under its options to renew its
leases [575-576].
The record of a civil action did not support a finding that a trustee's conduct
amounted to an unfair and deceptive business practice under G. L. c. 93A.
[576-577]

CIVIL ACTION commenced in the Superior Court Department on
July 9, 2002.

---

[1]Of the Theodore W. Nickerson Trust. After the case began, Fleet National
Bank was merged into Bank of America, N.A. For simplicity and convenience,
we continue to refer to the defendant bank as "Fleet."

[2]Edmund Nickerson, Kenneth Nickerson, Theodora Burson, and Diana
Lapham.

The case was heard by *Regina L. Quinlan*, J., and motions for amended findings and for reconsideration were also heard by her.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*S. Elaine McChesney* (*Laura K. Langley* with her) for Fleet National Bank.

*Thomas F. Sullivan* (*Hrant H. Russian* with him) for the plaintiff.

SPINA, J. The plaintiff, T.W. Nickerson, Inc., commenced a civil action against the defendants Fleet National Bank (Fleet), trustee of the Theodore W. Nickerson Trust, and Edmund Nickerson, Kenneth Nickerson, Theodora Burson, and Diana Lapham, the four remainder beneficiaries of the trust. The complaint alleged claims for violations of the covenant of good faith and fair dealing and G. L. c. 93A. After a jury-waived trial, a judge in the Superior Court ordered judgment for the defendants on all counts. The Appeals Court reversed the judgment of all claims against Fleet and partially reversed the judgment as to the beneficiaries, remanding for further proceedings and an assessment of damages. *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 73 Mass. App. Ct. 434, 452 (2009). We granted Fleet's application for further appellate review and denied the remainder beneficiaries' application for further appellate review. We affirm the judgment of the Superior Court as to Fleet.

1. *Factual background and procedural history.* We summarize the facts, relying on the findings made by the Superior Court judge, supplementing where necessary by undisputed record evidence, and reserving the development of other facts to the discussion of specific issues. The plaintiff operates a "stump dump" business on leased property in Chatham.[3] Fleet held legal title to the property as trustee of the Theodore W. Nickerson Trust (trust), while beneficial title was held by the grantor's wife, Lillian, for her life, and by the grantor's children as the remainder beneficiaries (beneficiaries).

Steven T. Clark, a relation of the Nickerson family, owned

---

[3]The plaintiff explains that local landscapers, homeowners, and contractors bring trees or shrubs to the "stump dump," which composts those materials into other products for sale.

the stock of and was the president and treasurer of the plaintiff. On June 17, 1993, Fleet entered into two leases with the plaintiff — the business premises lease and the stump dump lease — for two separate parcels of the property held by Fleet as trustee. The leases each contained an option to renew and a right of first refusal, and expired on June 30, 2001.

In the spring of 2000, Clark engaged in discussions with the beneficiaries about purchasing the property owned by the trust and made an offer to purchase the property for $300,000: $30,000 with a note for the balance of $270,000. In June, 2000, Russell E. Haddleton, an attorney for Fleet, sent a draft purchase and sale agreement to Clark's attorney. Clark did not sign the draft because there was a title issue for the parties to resolve.

In 2000 Timothy Hannon became the trust officer for Fleet assigned to the trust. Clark informed Hannon that the beneficiaries had agreed to a sale price of $300,000, but that there was a title problem affecting the premises. On September 18 Hannon sent a letter to Edmund,[4] one of the beneficiaries, who was handling his mother's (Lillian's) affairs, stating that Fleet was concerned about the purchase price, and that it may require "those family members with an interest in the Trust to execute some type of hold harmless agreement" to protect Fleet. Edmund sent an electronic message (e-mail) to Hannon on September 22, which said, in part, "You know it amazes me the lawyer[s] are having such a problem with the sale to [Clark]." He wrote that there should be no problems with the deed and that "[a]s for the selling price, the [beneficiaries] will be willing to sign whatever papers are needed to keep Fleet harmless. You have been informed why it is important to expedite the sale. (Age and liability)."

Clark also spoke with Edmund for assistance with the title issues. Edmund felt there were no issues with the title, and that Clark and Fleet should keep working toward a purchase and sale agreement. Clark then telephoned Hannon, told him about the conversation with Edmund, and requested a meeting of all parties.

In the meantime, the plaintiff timely exercised its option to renew under the leases by letters from the plaintiff's attorney,

---

[4]We will refer to the Nickersons by their first names for ease of reference.

Hrant Russian, dated November 9, 2000. In addition to the renewal notice, each letter stated that "if no agreement is reached [as to the rental amount], then, we should proceed to [arbitration]," as provided in the leases.

Haddleton, the attorney for Fleet, engaged a title examiner to confirm the record title for the trust property. There were questions about possible defects in the title because of vague deed descriptions and references to boundary markers that no longer existed. Meanwhile, on November 11, 2000, Edmund sent an e-mail to Hannon telling him not to discuss renewal of the leases with the plaintiff until May, 2001, which was one month before the lease was set to expire, because he thought Clark was ultimately going to buy the property, making the lease renewal moot.

In December, 2000, Russian sent a draft purchase and sale agreement to Haddleton. Haddleton was informed that Clark would take title if the title search confirmed that good and clear title could be established with adverse possession. Accordingly, the parties continued to inquire into the title of the trust property for the next few months, but the draft purchase and sale agreement was never signed.

In February, 2001, the plaintiff resumed lease negotiations with Hannon, but Edmund continued to postpone lease renewals until May, 2001. Accordingly, throughout April, 2001, Clark continued to inquire into the title issues and purchase of the property. In addition, Hannon told Clark that the terms of the lease, including the rights of first refusal, would be extended until the new leases had been negotiated. On May 18, 2001, there was a meeting among Clark, Russian, Hannon, Edmund, Haddleton, and the title examiner. The parties discussed the title issues and determined that the plaintiff would assert by adverse possession ownership to the areas in dispute. Edmund agreed to assist in obtaining affidavits necessary for a claim of adverse possession. When Clark raised the issue of lease renewal, Hannon said the leases would be extended for an additional ten-year period with a ten per cent increase in rent. Following the meeting, Clark purchased additional business equipment in anticipation of purchasing the property.

In the fall of 2001, Fleet retained George de Verges to represent it in the negotiations regarding the new leases. The attorneys

exchanged numerous draft leases during the end of 2001 and into 2002. During these negotiations, the main issues were the rental amount and the extent of the leasehold premises. The plaintiff wanted to expand the property within the leasehold, which Fleet and the beneficiaries did not want to do.

On April 3, 2002, Hannon submitted the proposed leases, with a five per cent rent increase, to Fleet's real estate administration committee for approval. The committee requested that Hannon obtain an appraisal of the fair rental value, which Hannon immediately ordered. Although Clark testified that he had no knowledge the leases had to be approved by a bank committee, the judge found that de Verges sent a letter to Russian on November 15, 2001, indicating the leases would need to be approved by individuals at Fleet with authority to bind the trustee. Hannon informed Clark that he had ordered an appraisal one week after the committee's decision, and Clark agreed to wait for the appraisals to be completed.

On April 11, 2002, Lillian died. Immediately after Lillian's death, Clark telephoned Hannon to ask what this meant with respect to the trust property. Hannon told Clark that everything — including the lease renewal and purchase negotiations — was on hold. Fleet took the position that the trust would be terminated as a result of Lillian's death and that, as trustee, its authority was limited to winding down the affairs of the trust and distributing the body of the trust to the beneficiaries. On April 16, Fleet stated in a letter to Edmund that the trust "is now due to terminate." In addition, in an e-mail on that date between Hannon and Fleet's vice-president and relationship manager Geoffrey Reuland, Hannon stated that, with respect to the rental amount, "[a]t this point" the beneficiaries and the plaintiff were on their own. On May 23 de Verges wrote a letter to the plaintiff's attorney, detailing the termination of the trust and Fleet's inability to negotiate the lease renewals in light of the trust termination.

At Lillian's memorial service in May, 2002, Clark again spoke with Edmund about buying the property, and Edmund said he would accept $200,000, but title had to be taken "as is," and Edmund's brother Kenneth had to be allowed to continue the operation of his farm on the property. Despite this conversation, Clark never brought a formal offer to purchase to Edmund.

In May, 2002, another of Fleet's trust property tenants, Anthony Bridgewater, contacted Fleet about a leaky roof. When Bridgewater returned with an estimate for $15,000, Fleet told Bridgewater that the property was being sold to the plaintiff by the beneficiaries, and that Fleet would not be involved. Bridgewater then spoke to Clark about the roof, who indicated that the plaintiff was also not interested in fixing the roof. Later that month, Bridgewater spoke with Kenneth and learned that the beneficiaries were negotiating with Clark to sell him the property for $200,000. Bridgewater offered to buy it for "$400,000, straight away."

Bridgewater's attorney drafted a purchase and sale agreement for the trust property, which called for a cash sale, no contingencies, and title taken by the Bridgewaters "as is." Prior to signing the purchase and sale agreement, Edmund contacted Hannon about the offer to purchase by Bridgewater. Hannon told Edmund that Fleet would not be involved in the sale of the property and that the beneficiaries should handle the matter themselves. The purchase and sale agreement was signed by the Bridgewaters and the beneficiaries on May 30, 2002.

On June 2, 2002, Clark met with Bridgewater, who told Clark that he and his wife were buying the property for $400,000 "as is" and that the agreement had been signed. On June 25, 2002, Russian wrote to Hannon, referencing the right of first refusal and stating that "[i]f there is a bona fide offer, my client takes the position that [Fleet] or *to whomever the bona fide offer was given*, had the obligation . . . to send all of the terms and provisions of the bona fide offer to my client . . ." (emphasis added). Fleet did not respond to this letter, and in a subsequent exchange between Fleet and Edmund, Fleet stated that "[Clark and Fleet] discussed the distribution of the property to [the beneficiaries] and that [Fleet] would not be selling directly to a buyer." Fleet further told Edmund, on July 3, 2002, that "[the plaintiff] retains the right to renew even if the leases have expired. That includes the Right of First Refusal."[5]

On July 9, 2002, Fleet delivered the deed to Edmund, and the

[5]The plaintiff, in its brief to the Appeals Court, argued that the judge's finding that "Edmund was not aware that Hannon had told Clark that all of the terms and conditions of the 1991 leases would continue while the new leases

closing between the Bridgewaters and the beneficiaries occurred the next day, July 10. Neither Fleet nor the beneficiaries provided notice to the plaintiff of the terms of Bridgewater's offer. Thereafter, the plaintiff brought this action, initially against Fleet, the beneficiaries, and Bridgewater.[6]

In March, 2005, the plaintiff filed a second amended complaint, bringing three counts each against Fleet and the beneficiaries, alleging that both Fleet and the beneficiaries had committed a breach of the implied covenant of good faith and fair dealing regarding its rights under the option to renew; that both Fleet and the beneficiaries had committed a breach of the implied covenant of good faith and fair dealing regarding its rights under the right of first refusal; and that the conduct of both Fleet and the beneficiaries violated G. L. c. 93A (c. 93A).

After a bench trial, a Superior Court judge made findings of fact and rulings of law, and issued an order for judgment. The judge initially found Fleet liable for breach of the covenant of good faith and fair dealing with respect to the plaintiff's rights under the option to renew the leases, and found for both Fleet and the beneficiaries on the plaintiff's other claims, including the right of first refusal and c. 93A. The judge concluded that the plaintiff received constructive notice of the Bridgewaters' offer and never exercised its right of first refusal after receiving constructive notice. Because the plaintiff failed to exercise its right of first refusal, the judge concluded that it could not make

---

were being negotiated" was not supported by the evidence presented at trial. The Appeals Court addresses this point in passing. See *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 73 Mass. App. Ct. 434, 444-445 & n.8 (2009). The parties are now in agreement that Edmund was informed by Fleet that the terms of the leases would continue. As this finding may have been incorrect, we rely on exhibits from trial that indicate that Fleet did inform Edmund of the continued right of first refusal.

[6]After the lawsuit was filed, the plaintiff and the Bridgewaters had discussions about the leases. The Bridgewaters were willing to accept the leases negotiated by Fleet, with two exceptions: they wanted the plaintiff to remove certain debris that had accumulated on the premises over the years, and they wanted the complaint to be dismissed with prejudice as to them. In January, 2003, new leases consistent with these terms were executed, as was a stipulation of dismissal with prejudice as to the Bridgewaters. The plaintiff is only seeking monetary damages as to Fleet and need not seek specific performance against the Bridgewaters. See *Sudbury* v. *Scott*, 439 Mass. 288, 297 (2003); 25 S. Williston, Contracts § 67.85, at 505 (R. Lord 4th ed. 2002).

a claim for breach of the covenant of good faith and fair dealing. In response, Fleet filed a motion for amended findings, and the plaintiff filed a motion for reconsideration. After a hearing, the judge issued a revised order, amending her decision to order judgment in favor of Fleet on the plaintiff's claim for breach of the implied covenant of good faith and fair dealing regarding the option to renew, and retaining the remaining rulings. The judge determined that Fleet, because it had not received the offer, had no obligation to give notice to the plaintiff, and did not violate the right of first refusal.

The plaintiff appealed. The Appeals Court reversed the judgment of the Superior Court, concluding that Fleet had violated the implied covenant of good faith and fair dealing regarding the plaintiff's option to renew and the rights of first refusal and violated c. 93A. The Appeals Court concluded that Fleet sought to avoid its responsibility to the plaintiff under the leases by refusing to deal with the offer made by Bridgewater. In addition, the Appeals Court reversed the judgment for the beneficiaries, concluding that the beneficiaries had violated the implied covenant of good faith and fair dealing regarding the plaintiff's rights of first refusal. See *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 73 Mass. App. Ct. 434, 447-450 (2009).

Fleet and the beneficiaries sought further appellate review in this court. We granted further appellate review to Fleet, with review limited to issues concerning Fleet's alleged violations of the implied covenant of good faith and fair dealing and of c. 93A. We denied the beneficiaries' application for further appellate review.

2. *Standard of review.* The standard of review is well established. The findings of fact of the judge are accepted unless they are clearly erroneous. *Anastos* v. *Sable*, 443 Mass. 146, 149 (2004). We review the judge's legal conclusions de novo. *Id.*

3. *The implied covenant of good faith and fair dealing.* The plaintiff argues that the judge erred in determining that Fleet did not violate the implied covenant of good faith and fair dealing regarding the option to renew and the rights of first refusal. We affirm the judge's decision, but for different reasons.

"Every contract implies good faith and fair dealing between

the parties to it." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 (1991), quoting *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 362 n.9 (1990). The covenant of good faith and fair dealing requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, *supra* at 471-472, quoting *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976).

However, the "scope of the covenant is only as broad as the contract that governs the particular relationship." *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005). It cannot "create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

In determining whether a party violated the implied covenant of good faith and fair dealing, we look to the party's manner of performance. *Ayash* v. *Dana-Farber Cancer Inst.*, *supra*. There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. *Nile* v. *Nile*, 432 Mass. 390, 398-399 (2000). 23 S. Williston, Contracts § 63.22, at 507 (R. Lord 4th ed. 2002). The lack of good faith can be inferred from the totality of the circumstances. *Nile* v. *Nile*, *supra* at 399.

a. *Termination of trust.* The plaintiff argues on appeal that Fleet's decision to terminate the trust on Lillian's death was improper under the terms of the trust and violated the covenant of good faith and fair dealing regarding both the option to renew and the right of first refusal.

The issue whether the trust was terminated properly was not raised by the plaintiff at trial and, accordingly, is waived. *Century Fire & Marine Ins. Corp.* v. *Bank of New England-Bristol County, N.A.*, 405 Mass. 420, 421 n.2 (1989). Even had the argument not been waived, the plaintiff lacks standing to challenge Fleet's administration of the trust. See *Weaver* v. *Wood*, 425 Mass. 270,

275 (1997), cert. denied, 522 U.S. 1049 (1998) ("In the case of a private trust, only a named beneficiary, or one suing on his or her behalf, can maintain an action to enforce a trust"). Here, however, the plaintiff argues not only that the termination was improper but also that the trustee's actions under the trust affected the plaintiff's rights under the leases. Our focus is not whether the trust was properly terminated but whether, in the context of Fleet's management of the leases as trustee, the reason for termination (without regard for whether termination was correct) was evidence of a lack of good faith toward the plaintiff. In other words, we may look to the motive of the trustee in terminating the trust, as that may be relevant to whether the trustee acted in good faith as to the plaintiff's rights under the leases, to which we now turn.

b. *Right of first refusal.*[7] Each lease contained the following language regarding the right of first refusal:

> "The LESSOR grants to the LESSEE the right of first refusal to purchase the entire leasehold premises at a price equal to any bona fide offer received by the LESSOR for the property, said right of first refusal to expire upon the termination of this lease. . . . The LESSOR shall notify the LESSEE by Certified Mail, Return Receipt Requested, of any bona-fide offer and the LESSEE shall have thirty (30) days from receipt thereof in which to notify the LESSOR of its intent to exercise its right of first refusal as set forth above. The LESSEE shall then have sixty (60) days subsequent thereto in which to purchase said property in accordance with the terms of any said bona-fide offer."

A right of first refusal is a limitation on a property owner's ability to sell the property to a third party, requiring the owner

[7]The judge found that Bridgewater did not make an offer to Fleet. Fleet had no obligation to give notice of the offer to the plaintiff and did not violate the covenant of good faith and fair dealing. The judge also found that, because the plaintiff learned of the offer from Bridgewater, it was on constructive notice of the offer, and, after receiving constructive notice, it never exercised the right of first refusal. Because we conclude that Fleet had neither the power nor the intent to sell the property after determining that the trust would be terminated, we do not find it necessary to address the issue of constructive notice and agree that Fleet did not violate the covenant of good faith and fair dealing.

to first offer the property to the holder of the right at the third party's offering price and terms. *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp., supra* at 382.

Fleet argues that the Appeals Court was incorrect to conclude that it sought to avoid its responsibility under the leases. *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank, supra* at 449. Fleet contends that it did not violate the right of first refusal as it had no intention of selling the property after Lillian's death, and that it did not have the power to sell the property after Lillian's death, when it determined the trust should be terminated, despite being record owners of the property until it was officially conveyed to the beneficiaries. Accordingly, the plaintiff did not prove bad faith or lack of good faith in Fleet's actions concerning the right of first refusal.[8]

The Bridgewaters did not offer to purchase the property from Fleet; therefore, under the terms of the leases, the right was not triggered as to Fleet. *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp., supra* at 386. Moreover, evidence was presented that Fleet had no intention of selling the property after Lillian's death. A right of first refusal is applicable only if the owner elects to sell the property. *Roy* v. *George W. Greene, Inc.*, 404 Mass. 67, 71 (1989). A right of first refusal is "designed to afford the holder protection against a sale to others. That protection is only effective if, *in the event the owner has elected to sell the property*, the holder . . . has a realistic opportunity to meet the offer the owner has elected to accept" (emphasis added). *Id.* The right belongs "both to the owner of the property, who may decide whether to sell, as well as the holder of the right, who may decide whether to purchase at the price offered by the third party." *Bortolotti* v. *Hayden*, 449 Mass. 193, 201 (2007). See 25 S. Williston, Contracts § 67.85, at 503 (R. Lord 4th ed. 2002) ("The 'right of first refusal' or 'preemption' is conditioned upon the willingness of the owner to sell . . .").

Finally, Fleet argues that, once it determined that the trust would be terminated after Lillian's death, it lacked the power to sell or lease the trust property. We agree. Once a trust is terminated, and absent a specific grant of authority in the trust,

---

[8]The plaintiff's amended complaint does not allege that Fleet committed a breach of the terms of the leases regarding the right of first refusal.

the trustee has the power and obligation only to preserve the trust property while winding up the trust and delivering any trust property to the beneficiary. 5 A.W. Scott, W.F. Fratcher, & M.L. Ascher, Trusts § 36.1, at 2324-2326 (5th ed. 2008). Generally, the power of a trustee to sell property is limited on the termination of a trust. See *Heard* v. *Read*, 171 Mass. 374, 377 (1898) (without clear indication in will of testator's intent, trustees did not have power to sell real property after termination of trust). But see *Rothwell* v. *Rothwell*, 283 Mass. 563, 570 (1933) (power of trustee to sell property continued after termination of trust in light of specific direction in trust). Accordingly, because Fleet had neither the power nor the intent to sell the property, it did not violate the terms of the lease regarding the right of first refusal.

The plaintiff argues that Fleet violated the covenant of good faith and fair dealing by "(a) knowingly allowing the beneficiaries, as the new LESSOR, to violate their contractual obligations to the Company; and (b) by improperly terminating the trust in violation of the trust agreement in order to carry out its planned preemptive actions."

Fleet did not violate the covenant of good faith and fair dealing regarding the right of first refusal. As to the plaintiff's first argument, evidence was presented at trial that Fleet told the beneficiaries that the plaintiff's right of first refusal remained in effect after the lease ended; however, Fleet had no duty to police the beneficiaries' actions after giving this notice. Fleet's inaction could only amount to a lack of good faith if Fleet had a duty to act. *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp., supra.*

As to the plaintiff's second allegation, no evidence was presented by the plaintiff that there was an absence of good faith by Fleet in terminating the trust.

The scope of the covenant of good faith and fair dealing is shaped in each context by the nature of the contractual relationship. *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, 546 U.S. 927 (2005). The nature of this contractual relationship was between a lessee and a *trustee-lessor.* As previously stated, because the lessor is also a trustee, Fleet's motives in terminating the trust must be examined to determine whether the trustee

acted with an absence of good faith — relative to the plaintiff's rights under the leases.[9] If the trustee's motive in terminating the trust was to affect negatively the plaintiff's rights under the lease, then there may have been a valid claim for breach of the covenant of good faith and fair dealing.

There is a presumption that all parties act in good faith, and the plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith. 23 S. Williston, Contracts § 63.22, at 507 (R. Lord 4th ed. 2002). Here, no evidence of an improper motive in termination of the trust was presented at trial, and no facts presented at trial support a finding of an absence of good faith.

First, the plaintiff did not present any evidence that Fleet terminated the trust with the motive of negatively affecting the plaintiff's rights under the leases. Second, there was no evidence presented of any other improper motive on the part of Fleet. The plaintiff argues that Fleet's concern regarding potential environmental liability when the property sold is evidence that Fleet terminated the trust with a lack of good faith in order to avoid selling the property.[10] There were no findings by the judge on this issue; moreover, concern by the trustees regarding potential environmental liability is not evidence of the absence of good faith.

Finally, the plaintiff presented no evidence that Fleet terminated the trust in order to gain an advantage for itself. Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991) (holding plaintiff's use of discretionary right as pretext justified ruling that it committed breach of covenant of good faith and fair dealing); *Tufankjian* v. *Rockland Trust Co.*, 57

---

[9]As we discussed, *supra* at 570-571, we do not consider whether Fleet terminated the trust in accordance with the terms of the trust.

[10]On the date of Lillian's death, but prior to Fleet's learning of her death, Geoffrey Reuland, Fleet vice-president and relationship manager, wrote to Hannon, "Maybe I am just too cautious, but I don't like the smell of this. If the beneficiaries think there is an environmental liability surrounding the property, and if there is, I believe they are going to run for the hills and try to leave [Fleet] holding the bag. . . . Maybe there is something we should do preemptively." There is no indication that this message refers to termination of the trust. The next morning, after learning of Lillian's death, Reuland immediately wrote to Hannon that, in light of Lillian's death, the trust would distribute, and that the real estate had vested in three of the four beneficiaries.

Mass. App. Ct. 173, 178 (2003), quoting *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, *supra* (where bank sought to "recapture opportunities forgone on contracting" and secure better deal by its actions, jury warranted in finding breach of duty of good faith and fair dealing). Cf. also *Northern Heel Corp.* v. *Compo Indus., Inc.*, 851 F.2d 456, 471 (1st Cir. 1988) (where repudiation "was but a tool engineered to serve this illicit purpose" of extracting price concessions, there is breach of covenant of good faith and fair dealing).

c. *The option to renew.* The leases contained an option to renew for an additional ten-year term "at a rental to be agreed upon between the parties." If the parties could not agree on a rental amount, the lease provided a mechanism for proceeding to arbitration. Each lease further stated:

> "This option to renew shall be deemed to have been exercised upon receipt by LESSOR from LESSEE no later than six months prior to expiration of the term of said lease written notice of LESSEE's intent to exercise said option. It is agreed that negotiation regarding a new rental amount will commence upon receipt of said written notice from LESSEE. In the event LESSOR and LESSEE have not agreed upon a new rental amount in accordance with the terms of this paragraph by the expiration date of said lease it is agreed that LESSEE will pay to LESSOR the current rental amount until a new amount has been agreed upon. It is also agreed that said new rental amount will be retroactive to the date of commencement of the renewed lease and that at the time the amount is determined a one time adjustment will be made between the current rental amount and the new rental amount."

The plaintiff argues that Fleet (1) intentionally caused the plaintiff to be denied its rights under the option to renew by not signing the lease renewals and by causing a delay in signing until after the property was conveyed to the beneficiaries and then the Bridgewaters and (2) improperly terminated the trust to avoid signing the leases, both in breach of the covenant of good faith and fair dealing.

The judge found that "[t]here is no evidence that Fleet engaged

in dilatory tactics to defeat the plaintiff's right to exercise the option to renew. Until Lillian's death, Fleet treated the leases as if they had been extended. . . . Fleet did not violate that implied covenant. Fleet's acts with respect to the renewal of the leases did not have the effect of depriving the plaintiff of the benefit of the options under the circumstances of this case." The Appeals Court agreed that "none of Fleet's actions prior to Lillian's death breached the implied covenant of good faith and fair dealing in a way that interfered with the plaintiff's rights under the option to renew . . . and none of the facts found by the trial judge suffice to demonstrate bad faith delay on Fleet's part." *T.W. Nickerson, Inc.* v. *Fleet Nat'l Bank*, 73 Mass. App. Ct. 434, 450 (2009). However, the Appeals Court also determined that the "failure of Fleet, a fiduciary, to abide by the trust instrument authorizing it to act is sufficient to show the requisite lack of good faith." *Id.* at 451. For reasons discussed above, we agree with the trial court and disagree with the Appeals Court's decision regarding termination of the trust.

Fleet's power to renew the leases was limited once it had determined after Lillian's death that the trust would be terminated. Restatement (Second) of Trusts § 344, at 192 (1959). Moreover, as discussed, *supra*, the plaintiff presented no evidence that Fleet's motive in terminating the trust was to affect the rights of the plaintiff under the leases, including the option to renew. Therefore, Fleet did not breach the covenant of good faith and fair dealing regarding the option to renew the leases.

4. *Violation of G. L. c. 93A.* The plaintiff argues that Fleet violated c. 93A by (1) violating the implied covenant of good faith and fair dealing; (2) refusing to respond to a letter from the plaintiff that sought to exercise the right of first refusal; (3) not signing the lease renewals and causing any signing to be delayed for three months until after the property was sold to the Bridgewaters; and (4) terminating the trust in violation of the trust terms in order to convey the property to the beneficiaries and avoid signing the leases.

Fleet argues that the plaintiff presented no evidence of unfairness or deception. In addition, Fleet argues that, while a breach of the covenant of good faith and fair dealing may constitute a violation of c. 93A, it does not necessarily do so. *Massachusetts*

*Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995) ("We have said that a breach of the implied covenant of good faith and fair dealing *may* constitute an unfair or deceptive act or practice for the purposes of G. L. c. 93A" [emphasis added]); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, *supra* at 474-476 (holding judge's factual findings regarding breach of covenant of good faith and fair dealing established as matter of fact and matter of law; actions also violation of c. 93A); *Frostar Corp.* v. *Malloy*, 63 Mass. App. Ct. 96, 109 n.26 (2005) ("As the defendants correctly observe, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, [*supra*], does not support the plaintiffs' assertion that the finding of a breach of the covenant of good faith and fair dealing *compels* a finding of a violation of G. L. c. 93A" [emphasis added]). We need not decide here whether a breach of the covenant of good faith and fair dealing is a per se violation of c. 93A because, for reasons previously discussed, there was no evidence that Fleet violated the covenant of good faith and fair dealing.

The judge determined, "[N]otwithstanding the applicability of G. L. c. 93A to Fleet, the facts and circumstances presented do not support a finding that Fleet's conduct amounted to an unfair and deceptive business practice. Nor do the facts and circumstances support a finding that any losses occasioned by the plaintiff were caused by conduct of Fleet." We agree with these conclusions. We have considered the plaintiff's arguments as to c. 93A, and we conclude that there is no merit to any of them.

5. *Conclusion.* For the foregoing reasons, the judgment of the Superior Court as to Fleet is affirmed.

*So ordered.*