BOUDIN, Circuit Judge,
dissenting.
On February 18,1994, plaintiff-appellant Susan Lass obtained a loan of $40,000 secured by a mortgage on her home in Rehoboth, Massachusetts, the mortgage then being immediately assigned to Shawmut Mortgage Company. The form agreement, used for mortgages in Massachusetts guaranteed by Fannie Mae and Freddie Mac, provided in pertinent part:
5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire ... and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires.... If Borrower fails to maintain coverage described above, Lender may, at Lender’s option, obtain coverage to protect Lender’s rights in the Property in accordance with paragraph 7.
*142 7. Protection of Lender’s Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, .... then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender’s rights in the Property.
Another provision of Lass’ mortgage provided that when making monthly mortgage payments, Lass would also pay for separate items, including property taxes and insurance premiums. The lender would hold these payments, called “escrow items,” in an escrow account to cover such items when they were due.
On the same day that the mortgage was executed, Shawmut provided Lass with a separate document on company letterhead entitled “Flood Insurance Notification” (the “Notification”). This document informed Lass that her property was located in a “special flood hazard area” and that she would need to purchase flood insurance in the following provision:
[A]t the closing the property you are financing must be covered by flood insurance in the amount of the principle [sic] amount financed, or the maximum amount available, whichever is less. This insurance will be mandatory until the loan is paid in full.
Both the just quoted notice and the requirement that Shawmut provide such notice to Lass are imposed by federal law in aid of the government’s subsidized flood insurance program. 42 U.S.C. § 4104a(a)(l), (a)(8) (2006). Failure to provide such notice would have subjected Shawmut to a federal monetary penalty. Id. § 4012a(f)(2). This coverage mandated by government directive is required whether or not the lender requires insurance coverage for flooding or any other hazards.
At some point prior to November 2009, defendant-appellee Bank of America or one of its affiliated entities (for convenience we refer only to Bank of America) acquired Lass’ mortgage. Then, pursuant to paragraph 5 of the mortgage, Bank of America sent Lass on November 16, 2009, a form letter requiring her to purchase an additional $145,086 of flood insurance, which would insure her home up to its full replacement-cost value. The letter said that the bank would purchase the insurance if Lass failed to do so within seven weeks, but it urged that she buy it herself to avoid a more expensive purchase by the bank.
Despite a follow up bank letter, Lass failed to increase her coverage. The bank then obtained the insurance itself for the period in question, while offering Lass a refund of any duplicative premiums if she belatedly bought the insurance elsewhere, but Lass again declined to do so. The same pattern — warning, refusal by Lass and purchase by the bank of the additional insurance — occurred in 2010, and the bank offered her a further opportunity to purchase her own insurance after it extended the policy in 2011. In each instance, the bank took the premiums out of the escrow account.
Lass responded with the present lawsuit against the bank on April 1, 2011.[21] As amended, her complaint charged breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, and a count for violation of a federal statute that is not at issue on appeal. On the bank’s motion to dismiss, the district court dismissed all *143 of Lass’ counts, ruling that no claim had been stated. Lass v. Bank of America, NA., No. 11-10570-NMG, 2011 WL 3567280, at *8 (D.Mass. Aug. 11, 2011).
The explicit language of the mortgage entitled the bank to require Lass to purchase the additional insurance even though it would exceed the unpaid balance of the loan. Under the agreement, Lass had to maintain insurance against “loss by fire ... and any other hazards, including floods or flooding, for which Lender requires insurance,” and this shall be “in the amounts and for the periods that the Lender requires.” It is hard to imagine how the obligation could be more clearly expressed.
Lass relies upon the separate “Flood Insurance Notification” furnished by Shawmut on the day the mortgage was signed, advising her that she had to provide flood insurance to cover the “principle [sic] amount financed, or the maximum amount available, whichever is less ... until the loan is paid in full.” But the agreement says explicitly that flood insurance “shall be maintained in the amounts and for the periods that Lender requires,” indicating that the lender can require a different amount in a later period (emphasis added).
The separate Flood Insurance Notification, establishing specific mínimums (because the government so requires), does not purport to qualify this unequivocal obligation to maintain any hazard insurance in the amounts and for the periods the lender requires. Nor does the Flood Insurance Notification in any way conflict with or contradict this obligation: it merely establishes a government required minimum for flood insurance regardless of whether the lender requires insurance in a lesser amount or in no amount at all.
Nor does the provision allowing the bank to purchase insurance “to protect Lender’s rights in the Property” require that the insurance be limited to the unpaid balance. By virtue of its provision of the loan and the risks of nonpayment, the lender has an interest both in the loan amount and in the stream of interest payments; both give it ample reason to insist on insurance that goes beyond the unpaid balance of the loan and up' to the replacement cost. This is a practice is recommended by the Federal Emergency Management Agency and not at all unusual.[22]
Because the loan agreement explicitly allows the lender to increase the amount of flood insurance and to purchase the insurance if the mortgagor refused, the bank’s demand and purchase cannot themselves violate the implied covenant. See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 822 N.E.2d 667, 684 (2005) (“This implied covenant may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.” (internal quotation marks omitted)). Nor can Lass argue that the request for insurance up to replacement cost is extravagant or irrational. See note 22, above.
As an alternative argument, Lass asserts — offering various legal theories— that the bank charged an excessive amount for the insurance, and did so to generate *144 commissions for itself as the purchaser of the insurance. Lass alleges that Bank of America
charg[ed] borrowers sham ‘costs’ for flood insurance that did not reflect the true cost to Bank of America because a portion of such ‘costs’ were retained by Bank of America and/or its affiliates (or kicked back to them) as commissions or ‘other compensation,’ ... [and that Bank of America did so] for the purpose of ... generating commissions, interest, fees, and ‘other compensation’ for BOA and its affiliates.
Compl. ¶¶ 75, 76.
The bank repeatedly urged Lass to procure the additional insurance for herself; indeed, she already had flood insurance and could doubtless have increased her coverage — albeit for an increased premium. Specifically, the bank sent Lass six letters warning that bank-provided coverage might be more expensive than insurance that Lass could obtain on her own and exhorting Lass to buy her own insurance in terms such as “we urge you,” “we continue to encourage you,” or “BAC Home Loans strongly encourages you.” Several of these exhortations were set off in boldface type for emphasis. After each purchase, the bank even offered to cancel its lender-placed insurance and refund any duplicative premiums if Lass bought her own insurance.
Thus, the bank unquestionably had a legitimate interest in having the higher coverage to protect its loan and it repeatedly urged that Lass buy it herself. Given these circumstances, the notion that it sought the additional coverage so as to obtain the commission is unsupported by any facts alleged in the complaint that would make the “improper motive” charge remotely “plausible.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
Finally, Lass appears to claim that the bank overcharged her for the insurance it obtained. Three theories are offered: the covenant of good faith and fair dealing, unjust enrichment, and a fiduciary duty claim based on the fact that the bank drew on the escrow account to pay for the added insurance. In principle one can imagine that a bank, having properly insisted on replacement cost insurance and properly invoked its right to buy the insurance because the borrower refused, might nevertheless create liability for itself by imposing exorbitant or manifestly unfair charges.
However, Lass’ mortgage authorized the bank to fix the level of insurance, purchase it directly if Lass refused, and pay for it out of the escrow account, so all three claims would require some factual allegations that pointed to a lack of “good faith and fair dealing” in the price charged, T.W. Nickerson, Inc. v. Fleet Nat’l Bank, 456 Mass. 562, 924 N.E.2d 696, 704 (2010) (covenant claim), an “unjust” profit, Keller v. O'Brien, 425 Mass. 774, 683 N.E.2d 1026, 1029 (1997) (unjust enrichment), or unconscionable self-dealing, NRT New England, Inc. v. Moncure, 78 Mass.App. Ct. 397, 937 N.E.2d 999, 1004 (2010) (escrow claim).
The only relevant allegation in the complaint, quoted above, amounts to saying that the bank obtained a commission on the placement of the insurance. Placing insurance in exchange for commissions is what independent agents do all the time, and the bank can hardly place insurance without incurring costs of its own. Calling these “sham” costs or kickbacks is pure rhetoric, or “bald allegations” to which the district court was not required to defer, Iqbal, 556 U.S. at 681, 129 S.Ct. 1937, *145 especially because of the ease of pleading real facts (if they existed).
Lass could have compared what the bank took out of the escrow account as the cost of the additional insurance premium including any commission with comparable insurance provided through independent agents; possibly the discrepancies might have been great enough to make it possible, absent adequate explanation by the bank, to raise an inference that the bank was unduly profiting or otherwise unreasonable in how it went about the placement of the insurance. But the complaint provides nothing of the sort.
Finally, Lass complains that when the bank purchased insurance for her in January 2010, it made the policy effective as of November 1, 2009, charging her for over two months already passed. The bank requested that she buy more insurance by letter dated November 16, 2009, and the benefit of backdating the insurance is itself unexplained. But the bank gave Lass a full refund for the backdating policy before Lass initiated this litigation.
To sum up, the lender’s requirements in the loan agreement as to hazard insurance were adequately, if not perfectly, expressed (one has only to contrast paragraph 5 with the gibberish typical in insurance policies); the bank’s apparent choice to insist on replacement cost as a matter of course is likely over-rigid from a policy standpoint but that is a matter for regulators. There is nothing to warrant further proceedings in this case.

. The lawsuit is premised on the third of the three sets of forced insurance and the increased mortgage payments resulting from it, the bank having refunded the charges for the first two.

. National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27 (2007), http://www.fema.gov/library/view Record.do?id=2954. See generally Wells, Insuring to Value: Meeting a Critical Need (2d ed. 2007) (advocating that property owners insure to the full replacement cost of property); Klein, When Enough Is Not Enough: Correcting Market Inefficiencies in the Purchase and Sale of Residential Property Insurance, 18 Va. J. Soc. Pol’y & L. 345 (2011) (suggesting that insuring to a value below replacement cost constitutes "underinsurance,” a widespread problem caused by market inefficiencies).