NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-1047                                          Appeals Court

S.M. & another[1] vs.  M.P. & another.[2]


No. 15-P-1047.

Bristol.      April 12, 2016. - July 14, 2017.

Present:  Green, Trainor, & Milkey, JJ.


Adoption, Visitation rights.  Minor, Adoption, Visitation
     rights.  Parent and Child, Adoption.  Jurisdiction,
     Juvenile Court, Equitable.  Juvenile Court, Jurisdiction.
     Contract, Visitation rights, Condition, Implied covenant of
     good faith and fair dealing.



Complaint in equity filed in the Bristol County Division of
the Juvenile Court Department on July 14, 2014.

The case was heard by Siobhan E. Foley, J.


Harold N. Robertson for the defendants.


TRAINOR, J.  The plaintiffs are the biological parents of

two children whom the defendants have adopted.  At the time the

plaintiffs (biological parents) surrendered their parental

_____

[1] G.R.

[2] J.P.

rights, they entered into open adoption agreements with the defendants (adoptive parents) that allowed for continued visitation on certain specified terms.[3]  After the adoptive parents notified the biological parents that they were terminating visitation under the agreements, the biological parents filed an equity complaint for noncompliance with the adoption agreements, seeking their specific performance. Following a hearing, a Juvenile Court judge ruled in the biological parents' favor, while at the same time ordering them to discontinue a particular practice that the adoptive parents opposed.  On the adoptive parents' appeal, we vacate the judge's order and remand the matter for further proceedings.

Background.  The older child, Abby,[4] was born on June 2, 2008.  From about two weeks after her birth until thirteen months old, she lived with a cousin.  At age thirteen months, she was placed with her now parents, who adopted her when she was about three and one-half years old.  She has diagnoses of fetal alcohol syndrome, neurosensory hearing loss, and anxiety. She uses hearing aids; she has had physical therapy and occupational therapy services; she is followed by a speech therapist; and she has been involved with a counselor at school.

---

[3] Although we refer to the defendants as the "adoptive parents" for ease of reference, we emphasize that they are now the children's legal parents.

[4] A pseudonym.

The child was subject to a care and protection petition brought by the Department of Children and Families (DCF) in the Bristol County Division of the Juvenile Court Department. That matter was ultimately concluded with the biological parents and the adoptive parents executing an open adoption agreement.

On January 1, 2012, the biological parents had a second child, Betsy.[5] She was born with neonatal abstinence syndrome and was hospitalized following birth in the neonatal intensive care unit (NICU). She was placed directly with the adoptive parents upon discharge from the NICU, and at no point did the biological parents provide care for her. There was another care and protection petition brought by DCF on behalf of this child. She was also adopted by the adoptive parents. Open adoption agreements were executed identically for each biological parent, which declared the prior agreements to be null and void, became the governing agreements for both children, and provided for four supervised visits per year. Because the substantive terms of these agreements are identical, we will refer to them as "the agreement."

As pertinent here, the agreement provides that, in the event a visit "causes undue stress or anxiety to the Child," the adoptive parents "have the sole ability to modify visitation to conform to what they believe is in that child's best interest,

_____

[5] A pseudonym.

including the ability to terminate the visit." Further, "[t]he visits will be considered unduly stressful if either as a result of a visit, or in anticipation of one, the Child demonstrates, either verbally or behaviorally, that the visit is detrimental to the [child's] welfare." The agreement also requires the biological parents to provide a working telephone number to the adoptive parents, and further provides that failure to do so "may result in this agreement becoming null and void at the discretion of [the adoptive parents]." Lastly, the agreement provides that either party may seek specific performance of its terms.

In June, 2014, the adoptive mother sent the biological parents a letter purporting to terminate all future visits. As reasons therefor, she stated that the biological parents had failed to provide a working telephone number; they had "failed to stop referring to [themselves] as 'mom and dad' as agreed upon";[6] and the visits were causing "undue stress, anxiety and confusion to the children,"[7] and thus, "[w]e do not feel that it is in the best interest of the children to continue visits."

_____

[6] The adoptive parents had made this request of the biological parents, although it was not made part of the written agreement.

[7] At the hearing below, the adoptive mother testified that she believed the visits were causing Abby undue stress because "several days" after the visits, she would resume her old habit

After a hearing on the biological parents' petition for specific performance of the agreement, the judge found that their failure to provide a telephone number was not a material breach of the agreement, and that there was no indication that their use of the term "mom and dad" had caused undue stress or anxiety to Abby. The judge issued an order reinstating visitation pursuant to the terms of the agreement, and further ordering the biological parents to provide a working telephone number to the adoptive parents, and to refrain from engaging the children in conversation as to their status as biological parents.

On appeal, the adoptive parents allege that the judge erred by not following the requirements of G. L. c. 210, §§ 6C-6E (statute), which governs the enforcement of an open adoption agreement.[8] The adoptive parents claim that the judge

_____

of picking the skin off her fingers and toes, and this behavior would resolve several weeks after the visit.

[8] The adoptive parents state in their brief:

"Open Adoption Agreements are governed by [G. L. c. 210, §§ 6C-6E,] which limit judicial authority over their enforcement and preserve the rights of adoptive parents to make decisions on behalf of their children."

The adoptive parents specifically argue in this regard that

"[t]he court has no authority over conduct in a visit. It may modify an agreement only if it finds a change in circumstances . . . , which the court expressly did not find."

substituted her judgment for that of the adoptive parents, thereby abrogating their statutory and contractual rights. The adoptive parents also claim that the judge erred by finding that the biological parents' admitted breach of the provision in the agreement requiring them to provide a telephone number was an insufficient basis for the adoptive parents to exercise their explicit right to terminate visitation based on that breach. We discuss each argument in turn.

Discussion. 1. The Juvenile Court's equity powers. While the Juvenile Court Department has jurisdiction in equity in all matters arising under the provisions of chapters 119 and 210 of the General Laws, see G. L. c. 218, § 59, the sole remedy for the breach of a court-approved agreement (an open adoption agreement) for postadoption contact is a court order for specific performance. See G. L. c. 210, § 6D; Adoption of Tammy, 416 Mass. 205, 210 (1993) (law of adoption is entirely statutory and governing statute must be strictly followed). See also Beloin v. Bullett, 310 Mass. 206, 210 (1941). The agreement here explicitly mirrors the statute and requires that any enforcement of "the agreement [be pursued] by commencing a

_____

Despite the dissent's contentions to the contrary, the adoptive parents are appealing the fact that the judge modified the agreement without finding a material and substantial change in circumstances. The new prohibition against the biological parents referring to themselves as "mom and dad" was never in the original agreement.

civil action for specific performance."[9]  In addition to the
unequivocal statutory mandate, the general rule for the exercise
of equity jurisdiction is that no adequate and complete remedy
exists at law.[10]  See Bank of America, N.A. v. Diamond Financial,
LLC, 88 Mass. App. Ct. 564, 567 (2015), quoting from Cadigan v.
Brown, 120 Mass. 493, 494 (1876) ("Our courts . . . have limited
even express grants of equitable authority to situations where
there is no 'plain, adequate and complete remedy at law'").

The prescribed statutory and contractual procedure mandates
that "[i]n an enforcement proceeding, the court may modify the
terms of the agreement if the court finds that there has been a
material and substantial change in circumstances and the
modification is necessary in the best interests of the child"
(emphasis added).  G. L. c. 210, § 6D, inserted by St. 1999,
c. 3, § 21.  See the similar contract provision in article IV,
§ 3(d) of the agreement.  The Juvenile Court judge correctly
stated this standard in her findings and noted that "[t]he court
finds no material and substantial change in circumstances in the

---

[9] The court's order was issued pursuant to a petition in
equity.

[10] Specific performance is an equitable remedy, but it is
one that has been fully incorporated into our common law and is
employed when the common-law remedy is insufficient.  See
Keeton, An Introduction to Equity 241 (Pitman's Equity Series
6th ed. 1965).  Here, the General Court has determined that the
usual common-law remedy (monetary damages) is inadequate and has
provided the statutory remedy of specific performance.

present case."  The judge, however, then modified the terms of the agreement by ordering that the biological parents "shall not intentionally engage the minor children in conversation as to their status as their Biological Parents."

The fact that the judge did not follow the requirements of the statute or the agreement when she modified the agreement suggests that she believed that she was exercising her general equitable powers.  As we have already observed however, the court's general equitable powers are not available for use in matters controlled by the provisions of G. L. c. 210, §§ 6C & 6D, or in contradiction of the applicable and specific contract provisions.  Equity cannot be used when there is a prescribed and adequate remedy at law.  See Bank of America, N.A., 88 Mass. App. Ct. at 567.  Instead, the judge must follow the requirements of the statute and the agreement.  As we have observed, under the statute the judge's ability to modify the terms of the agreement rests on her finding of a material and substantial change in circumstances.[11]  However, the judge made

---

[11] The judge heard the adoptive mother's testimony that she believed that an oral agreement existed, whereby the biological parents agreed not to refer to themselves as "mom and dad," and that such agreement was subsequently breached.  Certainly, the judge could, within her discretion, find that the biological parents' persistent references to themselves as "mom and dad," in breach of an oral agreement not to do so, constituted a material and substantial change in circumstances, if she considered the evidence of the agreement and its breach to be both probative and credible.

no such finding here.[12]  Therefore, the judge's order must be
vacated and the matter remanded to the Juvenile Court.  This
will afford the judge the opportunity to comply with the
controlling provisions of the statute and the agreement by
entering the appropriate findings and an order of modification
if "a material and substantial change of circumstances" is
found, and the judge determines that "the modification is
necessary in the best interests of the child[ren]."

2.  <u>Discretion to terminate visitation</u>.  Under the
agreement, the adoptive parents and the biological parents had

---

[12]  The only limitation on the court's power to modify an
agreement is that it cannot "expand, enlarge or increase the
amount of contact between the birth parents and the child or
place new obligations on adoptive parents."  G. L. c. 210, § 6D.
See the similar provision in article IV, § 3(d) of the
agreement.  There are no other limitations to a modification in
either the statute or the agreement, except that any
modification be determined to be in the child's best interest.
In addition, the adoptive parents' determination that the
biological parents should no longer discuss or refer to
themselves as the children's biological parents could be based
on the provisions of G. L. c. 210, § 6E.  Section 6E, inserted
by St. 1999, c. 3, § 21, states:

> "Nothing contained in sections 6C and 6D shall be construed
> to abrogate the right of an adoptive parent to make
> decisions on behalf of his child."

"None of the words of a statute is to be regarded as
superfluous, but each is to be given its ordinary meaning
without overemphasizing its effect upon the other terms
appearing in the statute."  <u>Commonwealth</u> v. <u>Woods Hole, Martha's
Vineyard & Nantucket S.S. Authy</u>., 352 Mass. 617, 618 (1967),
quoting from <u>Bolster</u> v. <u>Commissioner of Corps. & Taxn</u>., 319
Mass. 81, 84-85 (1946).

agreed that "[the adoptive parents] or their designated agent (visitation center staff or monitor) retain[] sole discretion to terminate the visit if it is determined that either one of the Child(ren) is suffering from undue stress or anxiety either due to the actions or behavior of the biological parent or due to the Child[ren]'s special needs emotionally and/or medically." The agreement further states, "In the event that a visit with [the biological parent] causes undue stress or anxiety to the child[ren], [the adoptive parents] have the sole ability to modify visitation to conform to what they believe is in that child's best interest, including the ability to terminate the visit."

When a party to a contract is given sole discretionary power as to the occurrence of a condition, the exercise of such right is measured by whether the party has acted honestly and in good faith.  See 1A Corbin, Contracts § 165, at 86-87 (1963) ("Even if the promisor is himself to be the judge of the cause or condition [in a contract], he must use good faith and an honest judgment").  See also Murach v. Massachusetts Bonding & Ins. Co., 339 Mass. 184, 187 (1959) (insurer must exercise discretionary power to settle claims in good faith).

Similar to a contract in which the promisor agrees to perform on the condition that the promisor is personally satisfied, the occurrence of the condition present in this case,

as to the adoptive parents' ability to modify the children's visitation with the biological parents, "is dependent on the . . . individual judgment of [the adoptive parents as] the party to be satisfied." 2 Corbin, Contracts § 31.8, at 102 (rev. ed. fall supp. 2016).[13] In circumstances where a promise is conditioned solely on one party's personal satisfaction, the promisor's determination "even on the witness stand, is not conclusive." 2 Corbin, Contracts § 5.33, at 187 (rev. ed. 1995). Instead, "the promisor is subject to the requirement of good faith." Ibid. See 2 Corbin, Contracts § 5.32, at 177 n.5 (rev. ed. 1995), citing California Lettuce Growers v. Union Sugar Co., 45 Cal. 2d 474 (1955) ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing"); 8 Corbin, Contracts § 31.8, at 102 (rev. ed. fall supp. 2016) ("[T]he party's dissatisfaction cannot be given in bad faith, dishonestly, insincerely, or fraudulently").

---

[13] Where, as here, parties expressly agree that a condition is determined solely by one party's personal satisfaction, good faith measures that party's determination, and "the reasonableness or justice of the party's dissatisfaction cannot be questioned." 8 Corbin, Contracts § 31.8, at 102 (rev. ed. fall supp. 2016). In contrast, when a contract requires that a condition be determined by one party based on objective standards, the reasonableness of the determinant's decision is considered. See 2 Corbin, Contracts § 5.33 (rev. ed. 1995).

The agreement provides that the adoptive parents "retain[] sole discretion to terminate the visit[ation] if it is determined that either one of the Child(ren) is suffering from undue stress or anxiety." The adoptive parents have the sole ability to modify visitation to what they believe is in the child's best interest and, in making this determination, they "shall rely upon the input and observations made by the person(s) supervising the visit." The agreement further provides that "[the adoptive parents] or their designated agent . . . retains sole discretion to terminate the visit[ation] if it is determined that either . . . child[] is suffering from undue stress or anxiety" (emphasis added). The particular party supervising the visit is given the sole discretion to make that determination. But here, where Abby's symptoms manifested themselves after the actual visits, the adoptive parents retained the sole discretion to make that determination.

The adoptive parents' sole discretionary power is also similar to an option to terminate[14] that is contractually provided to a party when "supervening events or new information makes the original bargain unsatisfactory to the holder of the

---

[14] "The 'option to terminate' is a common method of producing a result very similar to that produced by making a promise conditional on personal satisfaction." 2 Corbin, Contracts § 6.10, at 291 (rev. ed. 1995). "The party having the power can . . . observ[e] results as performance of the contract proceeds and terminat[e] the contract if these results are not found to be satisfactory." Ibid.

power."  2 Corbin, Contracts § 6.10, at 291 (rev. ed. 1995).

Here, the adoptive parents have the discretionary right to

modify or terminate, if they so desire, the biological parents'

visitation with the children if such visitation causes the

children undue anxiety or stress.[15]  See ibid. ("[T]he . . .

'option to terminate' is not generally made conditional upon

dissatisfaction with the results[;] [i]t is a power to terminate

[the contract] if the contractor so wills and desires").

However, a party may not exercise its power to terminate a

contract without exercising such discretion in good faith.  See

2 Corbin, Contracts § 6.14 (rev. ed. 1995).

Therefore, the judge's review, upon remand, should be

primarily focused on, and limited to, a determination of whether

the adoptive parents exercised their sole discretion to

terminate the children's visitation with the biological parents

honestly and in good faith.

"[E]very contract in Massachusetts is subject to an implied

covenant of good faith and fair dealing."  Robert & Ardis James

Foundation v. Meyers, 474 Mass. 181, 188 (2016).  Here, the

judge, as the finder of fact, must make an explicit

---

[15] While the adoptive parents have an option to terminate
merely visitation, and not the agreement, under these
provisions, they also possess the discretionary right to
terminate the agreement upon a separate condition, if the
biological parents fail "to provide [the adoptive parents] with
a current address and working telephone number at all times."

determination as to whether the adoptive parents exercised their discretion in good faith. See Bay Colony R.R. v. Yarmouth, 470 Mass. 515, 524 (2015) (jury reasonably concluded party failed to act in good faith under contract). See also 2 Corbin, Contracts § 5.33, at 187 (rev. ed. 1995) ("[T]he honesty of the promisor's assertions and testimony [as to his personal satisfaction] is a matter of fact to be determined by the trier of fact"). In determining whether a party has breached the implied covenant of good faith and fair dealing, the judge may "look to the party's manner of performance." Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014), quoting from T.W. Nickerson, Inc. v. Fleet Natl. Bank, 456 Mass. 562, 570 (2010).[16] While "[t]here is no requirement that bad faith be shown . . . [t]he lack of good faith can be inferred from the totality of the circumstances." Weiler, supra, quoting from T.W. Nickerson, Inc., supra.

When considering whether the implied covenant of good faith and fair dealing was violated in the context of one party's discretion as the sole determinant of a condition, the Supreme Judicial Court has held that, in the totality of the circumstances, there was no breach where the party acted in good faith within its sole discretion as provided by the terms in the

_____

[16] "[In Massachusetts,] [t]here is a presumption that all parties act in good faith, and the plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith." T.W. Nickerson, Inc. v. Fleet Natl. Bank, supra at 574, citing 23 Williston, Contracts § 63.22, at 507 (Lord 4th ed. 2002).

contract. See Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287-290 (2007). "[T]he implied covenant of good faith and fair dealing cannot create rights and duties that are not already present in the contractual relationship." Id. at 289. See Merriam v. Demoulas Super Mkts., Inc., 464 Mass. 721, 731 (2013), quoting from Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 386 (2004) (stating that covenant does not "provide[] a specific form of protection that is not mentioned in the parties' contract"). Thus, the judge must look to the duties and terms provided in the agreement when determining whether the adoptive parents' discretionary action was within the scope of the covenant of good faith and fair dealing. See Eigerman, supra ("The covenant concerns the manner in which existing contractual duties are performed"); 2 Corbin, Contracts § 6.10, at 295 (rev. ed. 1995) ("The extent of the reserved power [to terminate a contract] depends upon the expressions in the agreement and the reasonable implications to be drawn therefrom").

Further, a party breaches the covenant of good faith and fair dealing when the party exceeds its contractual discretion or uses its discretionary power in a pretextual manner. See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473 (1991) (party's use of discretionary right as pretext justified judge's finding of breach of good faith and fair dealing);

Robert & Ardis James Foundation, 474 Mass. at 191 (breaching party "had taken an extreme and unwarranted view of his rights under the contract"). The party may also be in breach of the covenant of good faith and fair dealing as a result of the party's motivations. See T.W. Nickerson, Inc., 456 Mass. at 574 (looking to whether party's motive was "to affect negatively the plaintiff's rights" under the contract); Weiler, 469 Mass. at 84 (considering party's desire to enrich another at expense of plaintiff in determining breach of covenant of good faith and fair dealing).

In viewing the totality of the circumstances and terms provided by the adoption agreement, the judge may review not only the adoptive mother's testimony, but also, to the extent appropriate, the conclusions of the guardian ad litem (GAL) and the assigned supervisor's notes in determining whether the adoptive parents exercised good faith in making their discretionary determination.[17] Paragraph 13 of the agreement clearly states that the adoptive parents maintain "the sole ability to modify visitation to conform to what they believe is in th[e] child's best interest" (emphasis added). In making this determination they shall rely upon input and observations

---

[17] We note, however, that little, if any of these conclusions and notes may be probative of the adoptive parents' good faith because Abby's concerning behavior occurred after the visits, outside of the GAL and the visit supervisor's observation.

made by the person supervising the visit.[18]  The judge may consider, therefore, the GAL's conclusions and the assigned supervisors' observations only when determining if the adoptive parents' discretionary decision to terminate the children's visitation with the biological parents was made in good faith. See Uno Restaurants, Inc., 441 Mass. at 385 ("[T]he purpose of the covenant [of good faith and fair dealing] is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance"); Eigerman, 450 Mass. at 289 (scope of breach of covenant of good faith and fair dealing is within contract).

3.  Contact information requirement.  Finally, paragraph 25 of the agreement states that "[f]ailure on the part of [the biological parents] to provide [the adoptive parents] with a current address and working telephone number at all times may result in this agreement becoming null and void at the discretion of [the adoptive parents]."  This language is sufficient to create an express condition, which means, simply

---

[18] Paragraph 13 of the agreement reads in its entirety:

"In the event that a visit with [the biological parent] causes undue stress or anxiety to the Child, [the adoptive parents] have the sole ability to modify visitation to conform to what they believe is in that child's best interest, including the ability to terminate the visit.  In making this determination, [the adoptive parents] shall rely upon the input and observations made by the person(s) supervising the visit."

stated, that in the event that the plaintiffs fail to provide a working telephone number at all times, the adoptive parents, in their discretion, may terminate the agreement.[19]

Even if we were to determine that this provision was not an express condition and that the manner of enforcing the condition was discretionary (a question we do not decide), the exercise of the adoptive parents' subjective discretion would have appropriate limitations in contract law.  The covenant of good faith and fair dealing would be applicable in such a situation. "Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith.  See 3A Corbin, Contracts, § 644, pp 78-84." Burkhardt v. City Natl. Bank of Detroit, 57 Mich. App. 649, 652 (1975).  See McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 301-302 (1st Cir. 2004); Restatement (Second) of Contracts § 205 (1981).

There is no burden upon the adoptive parents to show harm in order to enforce such a contract provision.  In theory, the adoptive parents were only attempting to exercise the explicit right that they, and the biological parents, freely bargained

---

[19] See Restatement (Second) of Contracts § 226 comment a, at 170 (1981) ("No particular form of language is necessary to make an event a condition").

for in the contract.[20]  Having said that, however, the judge

concluded that it was inappropriate, in these circumstances, to

terminate the agreement because the biological parents' failure

to provide a working telephone number was not an intentional

act.[21]  We agree, but for a different reason.  The adoptive

parents had acquiesced in this failure for almost a year while

communicating solely by written correspondence.  A contract

condition can be waived by continuing to perform or to receive

performance from the other party if there is knowledge that the

condition has not been performed.  8 Corbin, Contracts § 40.4

(rev. ed. 1999).  The judge correctly deemed this provision to

have been waived.  See KACT, Inc. v. Rubin, 62 Mass. App. Ct.

689, 695 (2004), quoting from Attorney Gen. v. Industrial Natl.

Bank, 380 Mass. 533, 536 n.4 (1980) ("Waiver may occur by an

express and affirmative act, or may be inferred by a party's

---

[20] The judge found:

"The Open Adoption Agreement was entered into by the
parties freely, voluntarily and with a free understanding
of the consequences.  It was a valid contract between the
parties.  The Court notes all parties were represented by
counsel at the signing of the contract."

[21] The judge credited the biological mother's statement that
it was an accidental oversight on her part to not provide a
current telephone number.  But see Restatement (Second) of
Contracts § 225 comment e, at 169 (1981) ("Ignorance immaterial.
The rules stated in this Section apply without regard to whether
a party knows or does not know of the non-occurrence of a
condition of his duty").

conduct, where the conduct is 'consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible'"). The judge, appropriately, drew no negative inferences against the adoptive parents; nor did she impugn their motives. The judge, also appropriately, reinstated (or retained) the agreement's requirement of providing a working telephone number, including the provision for the potential negative consequences of failing to do so.

Conclusion. The judge's order is vacated and the matter is remanded to the Juvenile Court for further proceedings consistent with this opinion. The judge must follow the requirements of the relevant statutes, applicable provisions of the agreement, and our common law as related to contract interpretation and enforcement. Finally, the judge should consider whatever evidence is probative, and necessary, to determine whether the adoptive parents acted honestly and in good faith in terminating the agreement. Pending final disposition, the judge may make such temporary orders for continued visitation as she may deem appropriate.

So ordered.

MILKEY, J. (dissenting).  By today's ruling, we are displacing the Juvenile Court judge's thoughtful resolution of a challenging controversy with a problematic remand that is almost certain to please no one.  Because I view that disposition as neither necessary nor appropriate, I respectfully dissent.

Although the judge rejected the adoptive parents' argument that they had present cause to terminate the open adoption agreement, she agreed with them that it was their right to make "[t]he decision of when and how this information [regarding the biological parents' status] is to be conveyed to these children . . .."[1]  She therefore enjoined the biological parents from making such references going forward.  In this manner, the judge thoughtfully sought to forge a solution that directly would address the adoptive parents' concerns, while still allowing the biological parents the visitation rights that all parties contemplated in their agreement.  This resolution brought the parties to a point of stasis.  If the biological parents abided by the injunction so as not to engage in the behavior that the adoptive parents identified as the source of their daughter's stress, problem solved.  If they did not conform their behavior

---

[1] I follow the majority's lead of referring to the defendants as "adoptive parents" for ease of reference, while emphasizing that they now are the children's only legal parents. It bears noting, however, that at the point in time when they committed to allow visitation, the defendants were not the children's parents (adoptive or otherwise).

as required, the adoptive parents had multiple remedies available to them.  Notably, the judge achieved this resolution while deftly sidestepping having to engage in inherently intrusive inquiries into the adoptive parents' motives.

Two years have now passed with that Solomonic resolution in place.  As the adoptive parents confirmed at oral argument, because the judge's order was not stayed, the regular visits between the children and the biological parents have continued in the interim.  Now, we are upending the equilibrium that the judge achieved.  And to make matters worse, we are doing so in a way that maximizes judicial meddling with the parent-child relationship.

1.  <u>Propriety of the injunctive relief against the biological parents</u>.  The majority remands this case in great part because of its ruling that the judge erred when she ordered the biological parents not to refer to their status in front of the children.  According to the majority, the judge could have granted such relief only through a modification of the adoption agreement, which could have been done only if the judge had found a material and substantial change in circumstances.  The judge erred, the theory goes, by effectively modifying the agreement even though she found no such change in circumstances.[2]

_____

[2] The judge expressly found "no material and substantial change in circumstances in the present case."  It is not clear

The majority's conclusion that the judge's remedial options were limited in this manner, in turn, depends on its legal premise that the specific legislative parameters of G. L. c. 210, § 6D, effectively ousted the general equity jurisdiction that Juvenile Court judges otherwise enjoy pursuant to G. L. c. 218, § 59. That conclusion is the centerpiece of the majority's opinion.

For the reasons it states, the majority may well be correct that it would have been more proper for the judge to invoke § 6D, the modification provision of c. 210, as the basis for issuing the injunctive relief against the biological parents. But see Adoption of Vito, 431 Mass. 550, 560-561 (2000) (rejecting the argument that by enacting the open adoption agreement statute, the Legislature intended to prohibit judges from using their equitable power to order postadoption visitation where the parties had not entered into such an agreement). My quarrel is not with the majority's substantive conclusion on this point of law, but instead with its reaching the issue at all in the present posture of this case.

The injunctive relief requiring the biological parents to change their behavior was in the adoptive parents' favor; indeed, it gave the adoptive parents precisely what they

why the judge felt the need to address this issue where neither side requested a modification of the agreement. In any event, it appears that in issuing the injunctive relief against the biological parents, the judge believed she was exercising general equitable powers, not adding a term to the agreement.

originally had sought. The biological parents have not filed any cross appeal challenging the propriety of the injunctive relief entered against them, and the issue therefore, at a minimum, is not squarely presented. To be sure, the adoptive parents did touch on the issue in their appellate brief,[3] but neither they nor the biological parents have adequately briefed it.[4] Accordingly, we should not be reaching this issue in the current appeal. See Phillips v. Youth Dev. Program, Inc., 390 Mass. 652, 660 (1983) (recognizing that important legal questions "should not be resolved on an argument raised as an afterthought and not fully briefed on both sides"). See also Lee v. Mt. Ivy Press, L.P., 63 Mass. App. Ct. 538, 560 (2005), citing Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975) (where a party devoted only one paragraph of a sixty-five page brief to an issue and included no citations, that issue was waived).

Nor is the resolution of that issue likely to make any difference in this case. There are ample grounds on which the

---

[3] Although the relevant portion of the adoptive parents' brief is short and cryptic, they appear to be saying that the judge herself had a problem with the biological parents' conduct and resolved that problem only through an improper means.

[4] The adoptive parents addressed the propriety of the injunction against the biological parents only in passing. The biological parents, who are now representing themselves, did not file any brief.

judge could have found a material and substantial change in circumstances -- as the majority itself appears to acknowledge -- and therefore the judge in any event could have ordered the injunctive relief that she did.[5]  Once she focuses on that issue in the remand, I have little doubt that she will follow that path.

In sum, where the issue has not squarely been raised or adequately briefed, and it may not ultimately make any difference, our choosing to expound on it in the current appeal is improvident at best.  Having explained why I would not have reached the propriety of the injunctive relief issued against the biological parents, I turn now to my differences with the other possible justifications for a remand.

2.  Undue stress.  Abby[6] long has suffered from profound anxiety.  The adoptive parents' concern over that issue and their efforts to address it are highly laudable, and a testament to the love they have for their daughter.  Moreover, I certainly agree that if the adoptive parents had demonstrated that the biological parents' actions during the visits was the cause of

---

[5] Thus, the Juvenile Court plainly had jurisdiction to issue its order; the only question is whether it had to do so as a modification of the adoption agreement.  Accordingly, our reaching an issue not properly presented cannot be justified on the theory that it goes to the trial court's subject matter jurisdiction.

[6] A pseudonym.

Abby's behavior, as the adoptive mother testified, they would be within their rights to take action, including through termination of the visitation.[7]  However, nothing in the language of the adoption agreement relieves the adoptive parents of the obligation to demonstrate objectively a threshold connection between the anxious behaviors that Abby exhibited and the actions of the biological parents.  Rather, the agreement states that "[i]n the event that" a visit is causing undue stress, the adoptive parents have the "sole ability" to modify visitation as they see fit to remedy that stress.  Contrary to what the majority states, the agreement does not by its terms grant the adoptive parents the "sole ability" to determine the threshold question whether the visits are causing such stress.  Nor does

---

[7] The agreement expressly provides that if a visit is causing either child "undue stress," the adoptive parents "have the sole ability to modify visitation to conform to what they believe is in that child's best interest, including the ability to terminate the visit."  Strictly speaking, these provisions speak in terms of the adoptive parents' ability to terminate individual visits, not in terms of terminating the agreement. However, mindful that we are to interpret the rights provided to biological parents by open adoption agreements narrowly in favor of upholding the rights of the children's legal parents, see G. L. c. 210, § 6E, I agree with the adoptive parents that -- in appropriate circumstances -- they could rely on the undue stress provisions as a basis for terminating all visitation with the affected child going forward.  It does not follow, as the adoptive parents appear to assume, that if visitation is fully terminated to address the particular sensitivities of one child, then they automatically can terminate any visitation with respect to the other child.  Given how she ruled, the judge had no occasion to consider how the relevant language of the agreement would apply with respect to that issue.

anything in the agreement imply that the adoptive parents have unreviewable discretion to determine whether visitation is causing the children undue stress. In fact, to the contrary, other provisions in the agreement demonstrate that the adoptive parents do not have unfettered discretion to terminate visitation based on unsupported allegations that the visits are causing stress.[8]

In addition, it is important to keep in mind the over-all context in which the question before us arises. Before the adoptions here were finalized (that is, at a time when the adoptive parents had no legal relationship with the children), the adoptive parents legally committed to allowing quarterly visits to go forward so long as the visits were not causing the children undue stress (and the biological parents otherwise were complying with the agreement's terms). In this context, it is not reasonable to conclude that the biological parents agreed -- in the absence of express language to that effect -- that their bargained-for rights to visit the children could be terminated

---

[8] For example, to the extent that the asserted stress is grounded in behaviors that the children exhibit during the visits, the agreement expressly provides that in determining what remedial measures should be taken, the adoptive parents "shall rely upon the input and observations made by the person(s) supervising the visit." Although this provision is not implicated here (since, by all third party reports, the visits themselves went remarkably well), its existence undercuts the adoptive parents' assertion that they had unreviewable discretion.

permanently based on a mere assertion by the adoptive parents that the visits were causing the children undue stress.  See Downer & Co., LLC v. STI Holding, Inc., 76 Mass. App. Ct. 786, 797 (2010) (contracts are to be interpreted to fulfil "the reasonable expectation of the parties when they entered into the contract").  It follows that the adoptive parents' contention that the biological parents' behavior was causing the skin picking was not insulated from judicial review.

As the plaintiffs in a specific performance action, the biological parents had the burden of proving the existence of the agreement and the adoptive parents' refusal to comply with its nominal terms.  However, whether the agreement properly had been terminated was an affirmative defense on which the adoptive parents bore the burden of proof.  See generally Patriot Power, LLC v. New Rounder, LLC, 91 Mass. App. Ct. 175, 179-180 (2017).  The judge's findings directly address whether they met their burden of proof regarding undue stress.  As she found, and the adoptive parents do not contest, "[t]here have been no reports made by the children to a licensed clinical social worker or other professional relative to stress or anxiety as a result of visits with the Biological Parents."  In fact, the hearing documented that while the visits between the children and the

biological parents went extremely well,[9] Abby gave no indication that she saw the biological parents as anything more than occasional playmates or that she was confused about who her parents were.[10]  As to the adoptive parents' claims that the visits were causing Abby's skin picking, the judge stated:  "At the present time, this Court does not find a sufficient nexus between [Abby's] behaviors and statements attributed to [the biological mother]."  Thus, the judge expressly found that the adoptive parents had not met their burden to provide sufficient proof that it was the biological parents' behavior during the visits that was causing Abby undue stress.

---

[9] For example, the court-appointed guardian ad litem (GAL) -- whose conclusions the judge expressly credited -- reported that the visit she observed between the children and the biological parents was "one of the best visits [she had] ever seen" in her thirty-eight-year career, and she emphatically concluded that continued visitation remained in the children's best interests.  The adoptive parents appear to fault the GAL for failing to look into whether Abby was exhibiting stress related to the visits outside of the visits themselves.  However, the GAL was not asked to examine that issue, something that is hardly surprising given that the adoptive mother raised it for the first time at the evidentiary hearing before the judge.

[10] The adoptive mother herself testified that Abby "understands that I'm her mother and [the adoptive father] is her father," and that the biological mother was merely "a friend that she plays with."  In addition, the GAL testified that six year olds such as Abby "know the people who take care of them every day as mommy and daddy," and that Abby had "never indicated . . . that she had any type of familial relationship with the [biological parents]," but instead knew them only as people who "were fun and she played with them and she had seen them periodically."

In fact, a close examination of the proof that the adoptive parents put forward demonstrates just how thin it was. The adoptive mother laid out the basis for her belief that the visits were causing Abby undue stress for the first time at the hearing. Specifically, she testified that "several days" after the visits, Abby would resume her old habit of picking the skin off her fingers and toes, and that this behavior would resolve prior to the next quarterly visit. Based on this timing, the adoptive mother attributed Abby's behavior to the visits causing her undue stress. Her specific concern was that the biological parents' references to themselves as "mom and dad" were causing such stress.[11]

Thus, the adoptive parents' proof of a causal nexus was based exclusively on observations that Abby resumed her skin picking several days after the visits and stopped it at some unspecified time before the next quarterly visit. Our case law recognizes the difficulties incumbent in trying to use gross temporal associations to prove what may be causing emotional distress in a child. See Guardianship of Yushiko, 50 Mass. App.

---

[11] The adoptive mother admitted in her testimony that, prior to the hearing, she never had raised the skin picking behavior as a reason for her concern about the visits. The biological mother addressed the fact that she was unaware of the skin picking concerns in her pro se closing argument. Although she denied that any actions she took had caused Abby to exhibit such behavior, she indicated that had she been made aware of it, "[w]e would have [taken] precautions."

Ct. 157, 159 (2000).  In Yushiko, we rejected a trial court finding that the child in question "experienced stuttering problems and physical manifestations of emotional upset upon her return from visitation with her father and that those episodes occurred more frequently prior to the [child's] move to Florida [with her guardians]."  As we explained,

> "[T]here is nothing in the evidence to suggest that the emotional distress experienced by the child after visits with her father was caused by those visits rather than the child's anxiety over the move to Florida.  Nor was there evidence that the return to her father would cause the child severe emotional trauma."

Ibid.[12]  Here, the judge was well within the bounds of her authority to conclude that the adoptive parents' proof was not sufficient to meet their burden.  Because her findings are not clearly erroneous, we are bound by them, and we should be affirming her ruling on that ground.

None of this is to say that I take issue with the majority's point that the judge could have rejected the adoptive parents' claims if she found they were put forward in bad faith.  I certainly agree with that proposition.  However, an inquiry into whether a parent is acting in good faith should be a last resort given the extent to which this mode of inquiry meddles

---

[12] It bears noting that in other contexts, proof of medical causation "generally must be established by expert testimony." Harlow v. Chin, 405 Mass. 697, 702 (1989) (medical malpractice). I do not think expert proof is necessarily required in the context of the case before us, but more proof than what the adoptive parents offered is.

with the parent-child relationship. See Adoption of Vito, 431 Mass. at 565 (cautioning judges against "meddling in the child's and adoptive family's life"). In fact, I cannot imagine anything more intrusive to the parent-child relationship than a searching inquiry into such questions as whether the adoptive parents sought to terminate visitation here not because it was going badly, but because it was going so well. In my view, the judge appropriately resolved the dispute before her without questioning the adoptive parents' honesty and good faith. She recognized that regardless of whether the adoptive mother honestly believed that the biological mother's references led Abby to pick her skin, this does not mean that such a belief actually was founded. Simply put, the judge understood that a good faith belief that a causal link exists does not equate to adequate proof of it.

3. Absent telephone number. I turn now to the remaining claim that the adoptive parents raised, namely the biological parents' temporary failure to provide a working telephone number. It is undisputed that the agreement required the biological parents to provide such a number and that the biological parents had not complied with this provision at the point that the adoptive parents purported to terminate all visitation. However, the judge found -- and the adoptive parents do not contest -- that the parties, historically, had

always communicated by mail without incident.  It is undisputed that the adoptive parents never asked for the missing telephone number, and the judge found that the biological parents promptly would have cured their omission had the adoptive parents called it to their attention.  Indeed, other than pointing out that they had to confirm the visits directly with the visitation center and not with the biological parents, the adoptive parents were unable to articulate -- either at the hearing in the court below or in the argument before us -- how the missing telephone number caused them or their children any problem whatsoever.

Citing to the Restatement (Second) of Contracts, the judge ruled that the biological parents' failure to provide a working telephone number was an "oversight" that was too inconsequential to preclude them from seeking specific performance of the agreement.[13]  To the extent that the majority concludes that the judge's analysis skirts over the fact that the agreement expressly grants them discretion to determine the agreement "null and void" based on the biological parents' failure to supply contact information, I agree.

The majority concludes that the judge's rejection of this ground should nevertheless be affirmed based on acquiescence.

---

[13] The judge cited the Restatement (Second) of Contracts for the five "significan[t]" factors that determine whether a given breach is material.  See Restatement (Second) of Contracts § 241, at 237 (1981):  "Circumstances Significant in Determining Whether a Failure is Material."

See generally <u>KACT, Inc</u>. v. <u>Rubin</u>, 62 Mass. App. Ct. 689, 695 (2004). Passing over whether such analysis necessarily is correct, I add that we could uphold what the judge did with respect to the telephone number issue on a separate ground. The adoptive parents acknowledge that their effort to declare the agreement null and void is not immune from all judicial review.[14] See <u>Computer Sys. of America, Inc</u>. v. <u>Western Reserve Life Assur. Co</u>., 19 Mass. App. Ct. 430, 437 & n.11 (1985), citing <u>Chandler, Gardener & Williams, Inc</u>. v. <u>Reynolds</u>, 250 Mass. 309, 314 (1924) (although a contract for the lease of certain equipment expressly entitled one party to terminate the agreement if it determined, in its "sole judgment," that the equipment had become obsolete, that provision still "must be exercised . . . in a reasonable and honest fashion"). See also <u>Anthony's Pier Four, Inc</u>. v. <u>HBC Assocs</u>., 411 Mass. 451, 473 (1991) (party's "use of a discretionary right under the agreements as a pretext justifies the judge's ruling that [it] breached the covenant of good faith and fair dealing").

The judge recognized that the adoptive parents purported to deprive the biological parents of their bargained-for visitation rights based on the missing telephone number even though the

---

[14] The adoptive parents suggest that their decision could be reviewed either for bad faith or for "an abuse of discretion." As to the latter, it would not be appropriate to graft that administrative law standard of review onto an action involving the exercise of discretion under a private contract.

biological parents' lapse in this regard had no material consequence for them. Because the judge believed that the telephone number issue could be resolved in the biological parents' favor on other grounds, she did not directly address whether the adoptive parents' purporting to declare the agreement null and void on this ground was pretextual. Nevertheless, that conclusion flows from the findings that the judge did make: if someone is unable to offer any justification for taking an action on a particular ground, then she must have pursued that action for a different reason. I emphasize that I accept that the adoptive parents honestly believed that termination of visitation was in their children's best interests, and I am not suggesting that they acted in bad faith in that sense. However, on the facts of this case, it is inescapable that the missing telephone number issue was not the real reason they were seeking to terminate the agreement. A remand is unnecessary to resolve that issue (regardless of whether acquiescence by itself suffices).[15]

   Conclusion. I close with the following observations. When circumstances permit, an adopted child potentially can benefit

_____

   [15] Moreover, our decisions recognize that remands can be avoided in cases involving the welfare of children where "the evidence before us on appeal 'convincingly establishes' that [a] result is correct." Prenaveau v. Prenaveau, 75 Mass. App. Ct. 131, 143 (2009), quoting from Rosenthal v. Maney, 51 Mass. App. Ct. 257, 272 (2001) (Duffly, J.).

from supportive relationships with her biological family.  Too much love, by itself, is seldom a problem.

All that said, relationships between adoptive families and biological families can be challenging even in the best of circumstances.  Open adoption agreements present one means of assisting parties in navigating such relationships.  See Adoption of Ilona, 459 Mass. 53, 65 n.15 (2011) (endorsing judges' encouraging biological parents and prospective adoptive parents to enter into open adoption agreements, presumably because their doing so minimizes the need for judicial intervention in familial relationships).  Here, the judge issued an order that thoughtfully sought to honor the agreement the parties freely reached, while still supporting the adoptive parents' judgment as to how the biological parents should conform their conduct in order to serve the best interests of the children.  For the reasons detailed above, we should be affirming that decision.